Charles Edward HARTMAN,
Petitioner–Appellant,

v.

STATE of Tennessee, Respondent–
Appellee.

Supreme Court of Tennessee,
at Nashville.

March 6, 1995.

Richard McGee, Nashville, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Merrilyn Feirman, Asst. Atty. Gen., Nashville, for appellee.

BIRCH, Justice.

The petitioner-appellant, Charles Edward Hartman, was convicted of first-degree murder and sentenced on May 23, 1983, to death by electrocution. His conviction and sentence were affirmed by this Court in *State v. Hartman*, 703 S.W.2d 106 (Tenn.1985), *cert. denied* 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986). On January 28, 1987, Hartman filed the post-conviction petition that is the subject of this appeal. In it, he raised numerous issues, including ineffective assistance of counsel during the sentencing

phase and prosecutorial misconduct resulting in a violation of his constitutional rights under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The post-conviction court found no merit in any of the issues presented and dismissed the petition. The Court of Criminal Appeals modified the judgment of the trial court and affirmed it as modified.[1] We granted review in this cause under Rule 11, Tenn.R.App.P., chiefly to consider the two above-described issues.

We now affirm the judgment of the Court of Criminal Appeals insofar as it upholds the conviction and vacates the sentence. The cause is remanded to the trial court for further sentencing proceedings.

█ As to the numerous issues raised, the primary one concerns the petitioner's allegations that the State violated his Sixth Amendment right to counsel. In particular, after he had been indicted and had retained counsel, the State arranged with his cellmate, Kenny King, and with another inmate, Raven "Snake" Frazier, to engage petitioner in conversations concerning the charges for the purpose of obtaining incriminating statements for use against him at trial. Ancillary to this claim, the petitioner alleged that the State failed to disclose, as part of the pretrial discovery process, that it had paid King $1000 for his efforts in procuring Frazier as an "independent" witness; the petitioner contended that this failure violated his right to due process. Also, the petitioner alleged several instances of ineffective assistance of trial counsel, and the most troubling one concerns trial counsel's failure to prepare adequately for the sentencing hearing. Moreover, in his application for Rule 11 review, petitioner asserted that the felony aggravating circumstance described in Tenn. Code Ann. § 39–2–203(i)(7) could not constitutionally be used to support the death penalty in this cause.[2]

---

1. *Hartman v. State*, No. 01–C–01–9008–CC–00146, 1992 WL 146756 (Tenn.Crim.App. at Nashville, filed June 30, 1992).

2. The five other issues included under this Court's order granting review are: ineffective assistance of counsel for failing to investigate

and interview witnesses and present their testimony at trial; ineffective assistance of counsel for failing to adequately voir dire prospective jurors concerning their views regarding the death penalty; the trial court's failure to define the aggravating circumstance in Tenn.Code Ann.

On appeal, a majority of the Court of Criminal Appeals affirmed the trial court's judgment; however, it vacated the jury-imposed death sentence and imposed a sentence of imprisonment for life. This modification is subject to the district attorney general's approval. If the district attorney general were to disapprove, a new sentencing hearing would be conducted. While the majority of the intermediate court agreed with the disposition of the case, each panel member based his opinion upon different grounds.

Judge Allen R. Cornelius, Jr., the author of the court's opinion, concluded that the petitioner had indeed received the effective assistance of counsel at all stages of the proceedings. He concluded also that through its role in recruiting King and Frazier to elicit incriminating statements from petitioner, the State had violated petitioner's Sixth Amendment right to counsel. Judge Cornelius ruled that Frazier's testimony should not have been admitted at the trial. Nevertheless, he reasoned that because the record contained otherwise sufficient evidence upon which the jury could have based its finding of guilt, its consideration of this testimony at the guilt-innocence stage of the trial was harmless error. However, because the nature of the testimony was "highly prejudicial and shocking," Judge Cornelius found that the testimony could have prejudiced the jurors during the penalty stage. Accordingly, the court vacated the death sentence.

Although he concurred with Judge Cornelius in vacation of sentence, Judge John K. Byers disagreed that the introduction of Frazier's testimony was constitutional error. Instead, he concluded that trial counsel had been ineffective during the penalty stage of the trial because he had failed to adequately prepare for it. Judge Robert K. Dwyer, the third member of the panel, found no constitutional violation at all and dissented. He would have affirmed the judgment of conviction and the sentence.

■ Upon review of the record, we agree with Judge Byers's conclusion that the ad-

mission of Frazier's testimony did not violate the petitioner's constitutional rights. We hold, however, that the sentence must be vacated and the cause remanded for resentencing under this Court's decisions in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), *State v. Howell,* 868 S.W.2d 238 (Tenn.1993), and *State v. Bigbee,* 885 S.W.2d 797 (Tenn. 1994). The issue of whether the Court of Criminal Appeals has authority to reduce a death sentence to life imprisonment has yet to be decided. We do not reach that issue, however, because in light of our remand the issue is moot. Because resentencing is required, we need not address the issue of trial counsel's effectiveness at the sentencing stage. In all other things, the judgment of the Court of Criminal Appeals is affirmed.

I

To better understand this case, a summary of the evidence presented at the original trial is helpful. On November 16, 1981, between the hours of 8:30 and 9:30 p.m., sixteen-year-old Kathy Nishiyama disappeared while driving from her boyfriend's home south of Clarksville to her home north of the city. Clarksville is located in Montgomery County, which adjoins Dickson and Houston counties. On that date, the petitioner was an inmate of the Dickson County jail. He held "trusty" status there, and his duties included the care and maintenance of the sheriff's patrol cars. On the evening of November 16, the petitioner chauffeured a sheriff's deputy in patrol car five to his home. The deputy then directed the petitioner to drive the car back to the Dickson County jail. Instead, petitioner refused to follow this directive and continued to drive the patrol car in Dickson and Montgomery counties. Although the petitioner drove away from the deputy's house in the patrol car at approximately 5:30 p.m., he did not return to the Dickson County jail until almost 3 a.m. the next morning.

Between 6 p.m. and 8 p.m. on the same evening, three Montgomery County residents were individually pulled over by a man in

§ 39–2–203(i)(5) ("heinous, atrocious or cruel"); denial of due process by the trial court's use of "the presumption shifting *Sandstrom* jury instruction"; and the trial court's refusal to permit

petitioner to introduce evidence of his innocence as a mitigating circumstance at the sentencing phase of his trial.

civilian clothes driving a patrol car. This man claimed to be an "undercover police officer." On each occasion, the "officer" asked for directions to Dickson. Two of these residents identified petitioner in court as the man who had pulled them over. Between 9:15 p.m. and 9:30 p.m. that night, a patrol car was observed by several persons as it travelled in Clarksville on Riverside Drive, which is located within two or three miles of the place the victim's car was found.

One of the persons who saw the patrol car was Roger Meckley, a Clarksville detective. He first saw the car as it travelled north on Riverside Drive in the same direction the victim could have taken to reach her home. Then, about fifteen minutes later, he saw the same car head south on Riverside Drive and turn onto Highway 48/13 to Dickson. Although he could not positively identify the petitioner at trial as the driver of the car, he did describe the driver as a white male with "longish" brown hair, wearing a green army fatigue-type jacket. This description comported with the petitioner's physical characteristics at that time and with the clothing he wore that night.

At approximately 10 p.m. that evening, a second person observed a patrol car stopped beside a small brown car (a description consistent with the victim's car) at the same location where the victim's car was ultimately found. A man in civilian clothes was standing beside the car and peering into it. This witness could not identify the petitioner as the man standing beside the car, nor could he identify the patrol car as Dickson County patrol car five. However, the dispatch records of neither the Montgomery County Sheriff nor the Clarksville Police reflect a traffic stop made at this location on that evening.

While investigating the victim's disappearance, authorities learned that the petitioner had been joyriding in a Dickson County Sheriff's patrol car that same night. John Cox, an agent employed by the Federal Bureau of Investigation, went to the Dickson County jail to interview the petitioner. The petitioner made several statements during the interview with Cox: first, that he had not been in Clarksville that night; second, that he did not know the Clarksville area well; and third, that during the night the patrol car ended up in a creek and Willie Harrell, an acquaintance, had towed it out. Each of these statements was subsequently contradicted by testimony offered at trial.

Noteworthy also is the testimony of a number of Dickson County Sheriff's deputies about their observations of a blood-like substance smeared near the trunk on the rear right fender of patrol car five upon its return. Authorities did not determine that the victim was dead until her body was found in a remote wooded area in Houston County three and one half months later.

Included in the cogent evidence arrayed against the petitioner was the testimony of Frazier. Frazier testified at trial that the petitioner had made a number of incriminating statements to him while they were incarcerated at the Main Prison in Nashville. According to Frazier, the petitioner told him that he turned the patrol car's blue lights on while driving behind the victim and that when she pulled over, he told her there was sickness in her family and that she needed to come with him. Frazier testified that the petitioner bragged that he had raped the victim—before and after he had killed her.

## II

At the post-conviction hearing, four persons involved in the education of incriminating statements from the petitioner testified. The first of these was Jack Hestle, the District Attorney General for Montgomery County at the time of the crime; he entered private practice in September 1982. The second was Richard Fisher, an Assistant District Attorney General for Davidson County. Although Fisher had prosecuted King in the past, King trusted him. Another witness was Pat McCutchen, Hestle's successor as the District Attorney General for Montgomery County; his office prosecuted this case. The fourth witness was Wade Bobo, the Assistant District Attorney General primarily responsible for the investigation and trial of this case under McCutchen's supervision.

Hestle testified that in late 1982 or early 1983, he was contacted by Frazier, an inmate

at the Main Prison in Nashville. Frazier was serving a sentence for second-degree murder and was soon to have a clemency hearing. Frazier told him that the petitioner had made incriminating statements to him about the Nishiyama case. He asked Hestle whether he thought it would improve his chances for clemency were he to obtain information about the Nishiyama case. Hestle advised him that he thought it might help.

At about the same time, King contacted Fisher and told him the petitioner had made incriminating statements about the case to him. King indicated an interest in any reward money offered. Fisher relayed this information to Hestle, who in turn contacted McCutchen and Bobo; he told them that the petitioner had apparently made incriminating statements to Frazier and King.

Thereafter, McCutchen, Bobo, and Fisher went to the Main Prison. On this first trip, Fisher went inside and talked to King. King made it clear to Fisher that he would not testify, but for $1000, he would attempt to record an incriminating conversation with the petitioner on audio tape and would provide a third-party witness to testify at trial. During this visit, King revealed a few details that the petitioner had told him. These included that the victim had been raped and that racial bias had been a motivation. Fisher relayed this information to McCutchen and Bobo; they agreed to provide the money King had demanded.

The next visit to the Main Prison occurred about two weeks before trial when Hestle and Bobo met with Frazier and then King. Frazier told them the petitioner had related details of the killing to him, including that the petitioner had raped the victim after he had slain her. When they met with King, he furnished other information about the incident, including the statement that the petitioner had used the blue lights of the patrol car to pull the victim over and had persuaded her to get into the car with him by telling her that a member of her family was sick. During this visit, King agreed to attempt to record the petitioner's statements on audio tape and to have a third party present (presumably Frazier) to authenticate the tape and testify at trial.

During a third visit a few days before trial, King reported that the tape recorder had malfunctioned, thereby thwarting the plan to record the conversation on tape. Nevertheless, Frazier confirmed that he had heard the petitioner make incriminating statements in King's presence and agreed to testify in return for protection from physical harm. Frazier testified at trial, and the petitioner was convicted and sentenced to death. After trial, $1000 was deposited to King's prison account as payment for his role in producing Frazier as a witness.

### III

The law is clear that the Sixth Amendment right to counsel attaches to all critical stages of a prosecution. "[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977) (*citing Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)). The United States Supreme Court has held that where government agents alerted a cooperating inmate to listen for any incriminating statements from an accused, even such passive conduct may be imputable to the government. The Court, in *United States v. Henry,* 447 U.S. 264, 275, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980), characterized such conduct on the part of government agents as a planned, "impermissible interference with the right to assistance of counsel."

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Maine v. Moulton,* 474 U.S. 159, 170–171, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985) (footnote omitted).

 There is no question that petitioner's Sixth Amendment right to counsel had attached at the time prosecutors talked with King and Frazier about the recording of petitioner's statements. Petitioner had already been indicted and had been represented by counsel for months. He was clearly entitled to rely on counsel as a "medium" between himself and the State. *See Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 (1985). Also, once King and Frazier had been approached by Bobo about recording any subsequent statements made by the petitioner, they were clearly acting as agents of the State.

> [K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 (citation omitted). Therefore, any statements made by the petitioner to the two inmates after they had been recruited by the State would be inadmissible. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; *State v. Webb,* 625 S.W.2d 259 (Tenn.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982); *State v. Berry,* 592 S.W.2d 553 (Tenn.1980), *cert. denied,* 449 U.S. 887, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980).

 The fact remains, however, that Frazier heard the petitioner make incriminating statements *before* he first contacted the authorities. Frazier had communicated with Hestle (and King with Fisher) to the effect that the petitioner had been bragging about the details of the crime before either of them ever met with the prosecutors. Actually, these communications precipitated the meetings with King and Frazier in the first place. Any admissions made by the petitioner before law enforcement authorities became involved would, of course, be admissible. As the U.S. Supreme Court has noted: "the Sixth Amendment is *not* violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 (emphasis added).

 From the testimony at the post-conviction hearing, no distinction appears between those details Frazier heard before he contacted Hestle and those he heard after becoming involved with the prosecutors. However, both Hestle and Bobo testified that their conversation with Frazier about obtaining petitioner's statement occurred after the petitioner had bragged to Frazier that he had raped the victim. Bobo recalled that it was King, not Frazier, who informed them that the petitioner had told him he had used the blue lights of the patrol car to pull the victim over. It is unclear from the record when Frazier heard this detail. Even if Frazier did not know of this particular detail before entering the State's employ, any error in admitting this portion of his testimony is subject to a harmless-error analysis. *State v. Sparks,* 727 S.W.2d 480, 482 (Tenn.1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); *see also, United States v. Henry,* 447 U.S. at 275, 100 S.Ct. at 2189 (footnote 13). Additionally, other cogent testimony supports the State's theory that the petitioner abducted the victim by using the blue lights of the patrol car to cause the victim to pull over. Three Montgomery County residents testified that a Dickson County "undercover officer" had pulled them over that same night by using the blue lights on the patrol car; two of these witnesses were able to identify the petitioner at trial as the person who had pulled them over. Moreover, another witness observed a county patrol car next to a car matching the description of the victim's car at the very spot where the victim's car was ultimately found. This witness described a man standing beside the

car as fitting the general appearance of the petitioner. Therefore, any testimony by Frazier that the petitioner used the car's blue lights to stop the victim, even if told to him after entering State "employ," was harmless beyond a reasonable doubt. His remaining testimony, unquestionably having been obtained before he ever spoke with the prosecutors, was admissible. Accordingly, petitioner's claim that this testimony violated his Sixth Amendment right to counsel is without merit.

## IV

▮ Petitioner claims that he was denied his right to confront the witnesses against him and asserts thereby that his due process right to a fair trial was violated because the State failed to inform him of the agreement to pay King to produce a witness to petitioner's incriminating statements. The State's case against the petitioner was strong indeed, but the only direct evidentiary link between the victim and the petitioner was the testimony of Frazier.

The United States Supreme Court has held that:

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *see also, State v. Davis,* 823 S.W.2d 217, 219 (Tenn.Crim.App.1991). The Court has specifically held that evidence impeaching a government witness's credibility may be exculpatory within the meaning of *Brady.* "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (*quoting Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). "Such evidence is 'evidence favorable to an accused,' *Brady,* 373 U.S. at 87[, 83 S.Ct. at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and

acquittal." *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *see also, State v. Williams,* 690 S.W.2d 517, 525 (Tenn.1985).

> Promises made by the state to a witness in exchange for his testimony relate directly to the credibility of the witness. A prosecutor has a duty to disclose evidence of any promises made by the state to a prosecution witness in exchange for his testimony.... This is especially true when the testimony of the witness is essential to the state's case.

*Moore v. Kemp,* 809 F.2d 702, 719 (11th Cir.1987), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).

As stated, the circumstantial evidence against petitioner was strong, even without the questioned testimony. Frazier's testimony, however, was the linchpin: that is, it served to tie the circumstances together and to provide contextual meaning. Clearly, any evidence that Frazier had been paid, promised clemency, or given any benefit whatsoever for his testimony should have been provided to defense counsel. The facts related at the post-conviction hearing, however, indicate that for his testimony Frazier received only the promise of protection from reprisal by other inmates. Bobo testified that the money was entirely King's. Trust account records at the prison reflect that the entire $1000 was deposited into King's account. The trial court found as a matter of fact that no evidence was introduced to prove that King shared or agreed to share the money with Frazier. In spite of our grave misgivings about testimony obtained in this manner, we are constrained to find that the proof offered at the post-conviction hearing fails to support the petitioner's contention of constitutional violation.

The petitioner suggests that McCutchen's and Bobo's later support for Frazier's clemency bid—McCutchen by writing a letter and Bobo by testifying at the clemency hearing—is evidence of a prior agreement. Each admitted having supported Frazier's clemency petition but denied that their support was in any way conditioned upon Frazier testifying at trial. Apparently, while Frazier may have hoped that his testimony at the petitioner's

trial would result in favorable treatment at his clemency hearing, no evidence of any promise made for such favorable treatment was adduced.[3] The only promise made to Frazier was that he would be protected from other inmates after he testified; this area was fully explored at trial during Frazier's cross-examination.

■ The question remains whether the fact that King, who did not testify at trial, received payment for helping the prosecution should have been disclosed to defense counsel. The United States Supreme Court has injected a "materiality" requirement into the rule that exculpatory information be provided to a defendant.

> [I]f the subject matter of such a [*Brady*] request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge.

*United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

> [I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial. . . .
>
> [U]nless the omission deprived the defendant of a fair trial, there is no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose. . . .
>
> The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense. . . .
>
> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This

means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*United States v. Agurs*, 427 U.S. at 104–113, 96 S.Ct. at 2398–2402. "Materiality" has more recently been defined as that which undermines confidence in the outcome of the trial.

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, *accord, State v. Davis*, 823 S.W.2d at 219.

We find the payment of $1000 to King to be immaterial. King did not testify; his credibility was not an issue at this trial. In light of the fact that Frazier had approached Hestle on his own before any discussion of payment to King occurred, the connection between Frazier and the money is tenuous at best. Therefore, the failure of the State to disclose this information to defense counsel did not in any way deprive the petitioner of a fair trial.

## V

■ The petitioner was convicted of first-degree murder in the perpetration of the felony of kidnapping. The jury found three aggravating circumstances to justify imposition of the death penalty: (1) that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; (2) that the murder was committed while the defendant was engaged in committing a felony (kidnapping); and (3) that the murder was committed by the defendant while he was in lawful custody or in a place

---

3. Incidentally, Frazier's petition for clemency was denied.

of lawful confinement or during his escape from lawful custody or from the place of lawful confinement.

■ Subsequent to the opinion of the Court of Criminal Appeals in this case, this Court released *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992). In *Middlebrooks*, a majority of the Court held unconstitutional the use of the aggravating circumstance described in Tenn.Code Ann. § 39–2–203(i)(7) [now § 39–13–204(i)(7) ][4] to support imposition of the death penalty for a conviction of first-degree murder committed in the commission of a felony. We determined that in such conviction, the use of this aggravating circumstance failed to narrow the class of death-eligible murderers as required by Article I, § 16, of the Tennessee Constitution. Inasmuch as the constitutional rule announced in *Middlebrooks* enhances the integrity and reliability of the fact-finding process of the trial, it must be applied retroactively in post-conviction proceedings. *See Meadows v. State*, 849 S.W.2d 748, 754 (Tenn. 1993); *Barber v. State*, 889 S.W.2d 185 (Tenn.1994). Thus, the jury in this case relied, in part, upon an invalid aggravating circumstance in determining punishment.

■ Nevertheless, neither the United States nor the Tennessee constitution prohibits a reviewing court from upholding a death sentence that is based in part on an invalid aggravating circumstance. To guarantee that a defendant will receive an individualized sentence, however, the reviewing court must either reweigh the aggravating and mitigating evidence or conduct a harmless-error review. *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *State v. Cazes*, 875 S.W.2d 253 (Tenn.1994); *State v. Howell*, 868 S.W.2d 238 (Tenn.1993).

We now review for harmless error and must now determine, based on the facts here present, whether the jury's consideration of the invalid aggravator constituted harmless error beyond a reasonable doubt. In *State v. Howell*, 868 S.W.2d at 260–261, we held that:

> [i]n order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

Initially, we point out that several factors here would appear to support a finding of harmless error under *Howell*. First, no additional evidence, nor any evidence that was not already properly before the jury, was introduced in support of the invalid aggravator. Moreover, the prosecutor did not emphasize the invalid aggravator in his jury argument. Furthermore, there was only minimal proof of mitigating circumstances. However, we cannot conclude, after a thorough review of the record, that the sentence would have been the same had the jury accorded no weight to the invalid aggravators. We reach this result because of our assessment of the remaining aggravators.

In *Howell*, we noted that a critical factor in our harmless-error analysis was the qualitative nature of each aggravating circumstance that remained after the invalid aggravator was removed from the sentencing equation. This Court stated an intention to look to the substance of the remaining circumstances and their persuasiveness, as well as to the quantum of proof supporting them. The objective reliability of a remaining aggravating circumstance is of particular importance in this evaluation. *Id.*

In this case, there are two remaining aggravators: the "heinous, atrocious or cruel"

---

4. Tenn.Code Ann. § 39–2–203(i)(7) states: "The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb...."

nature of the offense, Tenn.Code Ann. § 39–2–203(i)(5), and the petitioner's status as an "escapee" at the time of the crime, Tenn. Code Ann. § 39–2–203(i)(8). The record in this case supports the second of these two aggravators, which is purely objective in nature. The proof is uncontradicted that the petitioner was in the constructive custody of the Dickson County Sheriff's Department at the time the victim disappeared. The meaning of this circumstance and its application to the proof presented in this case is certain.

On the other hand, the other aggravator ("heinous, atrocious or cruel") is less objective in nature. This Court has sought to make it more objective by defining its terms and by requiring that the jury be instructed as to these definitions at the sentencing hearing of any trial where the death penalty is sought on the basis of this particular aggravator. *See State v. Williams,* 690 S.W.2d 517, 529–532 (Tenn.1985). While not error in the present case (see Issue IV, *infra*), the trial court did not instruct the jury as to these definitions. Also, a substantial amount of the proof presented to support this aggravator is included in the testimony of Frazier. While we do not redetermine the credibility of witnesses when conducting a harmless-error analysis of this sort, the fact that the credibility of a witness was so seriously contested is a relevant factor in determining whether we find beyond a reasonable doubt that an error of this nature was harmless. After disregarding the constitutionally invalid aggravator, where the remaining valid aggravator is substantially supported by the testimony in question, the harmless effect of the error in admitting the invalid aggravator is much more difficult to determine. Under the circumstances of this case, we are unable to conclude that the sentence would have been the same had the jury given no weight to the invalid aggravator. Accordingly, we remand the cause to the trial court for a new sentencing hearing in which the State may seek either statutory penalty. *See State v. Middlebrooks,* 840 S.W.2d at 347.

## VI

The purpose of the Sixth Amendment requirement for the effective assistance of counsel is to ensure that persons accused of crimes receive a fair trial.

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Article I, § 9 of the Tennessee Constitution and the Sixth Amendment to the United States Constitution are identical in import. *Baxter v. Rose,* 523 S.W.2d 930 (Tenn.1975).

The United States Supreme Court has defined two requirements for a finding that a defendant did not receive the effective assistance of counsel: (1) that counsel's performance was deficient to the degree that counsel was not functioning as the Sixth Amendment envisioned; and (2) that the deficient performance prejudiced the defense effort. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The second "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687, 104 S.Ct. at 2064. To prove deprivation of a fair trial, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068. If counsel's performance was in some way deficient, but a defendant cannot prove the deficiency prejudiced his defense, then any deficiency is deemed "harmless error," and counsel will not be held to be ineffective. 466 U.S. at 692, 104 S.Ct. at 2067.

There is a strong presumption that assistance rendered by an attorney falls within the wide range of reasonable professional assistance. The defendant must overcome this presumption of reasonableness, and he must show that the alleged deficiency was unsound trial strategy. 466 U.S. at 689, 104 S.Ct. at 2065. A reviewing court should look to all the circumstances of the case and evaluate the alleged deficiency from trial

counsel's perspective. 466 U.S. at 689, 104 S.Ct. at 2065.

■ Petitioner complains that trial counsel failed to adequately investigate the case, interview witnesses, and present certain testimony at trial. The evidence at the postconviction hearing, however, reflects that although counsel did not personally interview each of the one hundred fourteen witnesses whose identities had been provided to him before trial, he, co-counsel, or an investigator interviewed most of them before trial. Additionally, even as to the uninterviewed witnesses, the trial record establishes that counsel cross-examined those witnesses vigorously and illuminated discrepancies in their testimony. Moreover, contrary to petitioner's assertion, counsel did present testimony during the defense case to support the defendant's theory that the defendant had spent much of his time that evening looking for someone to pull the patrol car out of a creek. In short, we find that counsel's performance during the guilt phase of the trial was "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d at 936. This issue has no merit.

■ The petitioner also complains that trial counsel did not adequately voir dire prospective jurors on their respective attitudes about the death penalty. The decision whether to voir dire a prospective juror on this issue, or to what degree, is a strategic one. Valid tactical reasons exist to refrain from asking detailed questions on the death penalty, particularly in a case such as this where the defense is that the state has accused the wrong person. Too intense an inquiry in this regard may be perceived by potential jurors as a concession that credible evidence of guilt exists. Therefore, we cannot find that counsel here was ineffective for failing to delve deeper into this sensitive area. Furthermore, even if counsel's choice were deemed erroneous, the petitioner has failed to show prejudice. The record reflects the trial court asked each juror about his or her attitudes toward the death penalty. Indeed, this questioning resulted in a number of jurors being excused for cause. Because we find no evidence to indicate that this jury was less than fair or impartial, this issue has no merit.

■ Petitioner also advances allegations of ineffective assistance of counsel at the sentencing phase of the trial. Because we have determined that a new sentencing hearing is necessary under the holding of *State v. Howell, supra*, this issue is pretermitted.

■ During its instructions to the jury on aggravating circumstances, the trial court instructed pursuant to Tenn.Code Ann. § 39–2–203(i)(5) [now Tenn.Code Ann. § 39–13–204(i)(5) ]. Specifically, the court instructed that the jury could not impose the death penalty unless it found, beyond a reasonable doubt, "that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." The petitioner asserts that this instruction, without more, did not adequately channel the jury's discretion and is unconstitutionally vague. He cites the case of *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), for the proposition that the terms "heinous," "atrocious," and "cruel" should have been further defined.

The United States Supreme Court has clearly described the results to be sought from the use of aggravating factors: (1) to ensure that the sentencer's discretion is channeled and limited to minimize the risk of arbitrary and capricious imposition of the death penalty, *Arave v. Creech*, —— U.S. ——, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993); *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); and (2) to make sure that the capital sentencing scheme adequately narrows the class of persons eligible for the death penalty, that is, distinguishes those whose conduct deserves capital punishment from those whose conduct does not. *Arave v. Creech, supra; Lewis v. Jeffers, supra; Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

The United States Supreme Court in *Gregg v. Georgia* held Georgia's aggravating

circumstance [5] facially constitutional; it was almost identical to the instructions given the jury in the instant case. This Court has consistently held that the language of Tenn. Code Ann. § 39–2–203(i)(5) is not unconstitutionally vague or overbroad. *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981); *Strouth v. State,* 755 S.W.2d 819 (Tenn.Crim.App.1986). While it is true that in *Williams,* this Court expressed the preference that juries be fully instructed as to the definitions of those terms,[6] this Court has decided many cases since *Williams* in which the definitions of these terms were not included in the instructions to the jury. In these cases, the Court upheld the use of this aggravator. Some of these cases were tried before *Williams,* but decided after. *See State v. Barber,* 753 S.W.2d 659 (Tenn.1988); *State v. Zagorski,* 701 S.W.2d 808 (Tenn.1985); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985). There are, however, cases tried and appealed after *Williams* in which the definitions of those terms were not given to the jury, yet we upheld the use of the "heinous, atrocious and cruel" aggravator. *See State v. Irick,* 762 S.W.2d 121 (Tenn.1988); *State v. Porterfield,* 746 S.W.2d 441 (Tenn.1988). We deem it significant that the *Williams* case held that this aggravator was not unconstitutionally vague or overbroad. *State v. Williams,* 690 S.W.2d at 533; *see also, State v. Teel,* 793 S.W.2d 236 (Tenn.1990); *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989) (The language "especially heinous, atrocious or cruel" requires, in addition, a finding of "torture or depravity of mind." The Court held this additional language gave the jury sufficient guidance to prevent arbitrary sentencing.)

We find that the questioned jury instruction used in this case was valid; it provided the jury with guidance sufficient so as to avoid the possibility of an arbitrary or capricious sentence.[7] We note, however, that upon remand the trial court should adhere to the *Williams* holding if its instructions at resentencing include information regarding this aggravator.

■ We have examined the other issues included in our order granting review. These include allegations of error in instructing the jury that "malice is presumed" and in refusing to admit evidence of petitioner's innocence ("residual doubt" evidence) at sentencing. We find that any error in instructing the jury that "malice is presumed" is harmless, since the petitioner was convicted of felony murder, not premeditated murder. *See State v. McKay,* 680 S.W.2d 447, 451 (Tenn.1984). The remaining issue, concerning "residual doubt" evidence, was considered in the petitioner's direct appeal and resolved against him. *See State v. Hartman,* 703 S.W.2d at 119; Tenn.Code Ann. § 40–30–112(a).

The decision by the Court of Criminal Appeals is affirmed insofar as it upholds the petitioner's conviction for first-degree murder and vacates the sentence of death. The cause is remanded to the trial court for further sentencing proceedings.

ANDERSON, C.J., DROWOTA, J., and O'BRIEN, Special Justice, concur.

REID, J., concurring and dissenting.

REID, Justice, concurring and dissenting.

I concur in the majority's decision that the use of the invalid aggravating circumstance, the murder was committed while the petitioner was engaged in committing the felony of kidnapping, was prejudicial error requir-

---

5. The text of Georgia's similar aggravating circumstance had the following language: "[that the murder was] outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), later held the application of this circumstance could be unconstitutional when the facts of the case did not support a finding of torture, depravity, or an aggravated battery.

6. The Tennessee Pattern Jury Instructions have since been revised to include the definition of the terms "heinous," "atrocious," "cruel," and "torture." *See,* Tenn.Pattern Jury Instruction–Criminal 7.04 (1992).

7. While the trial court's failure to instruct the jury in accord with *Williams* does not by itself require relief be granted the petitioner under the circumstances of this case, the omission of the *Williams* definition has been a factor in our determination that the *Middlebrooks error was not harmless.*

ing that the sentence be vacated and the case remanded for resentencing.

I dissent from the majority's decision affirming the conviction. In my opinion, the record shows that the petitioner's constitutional right to counsel, as held by the United States Supreme Court in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and his constitutional right to due process, as found in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated during the guilt-innocence phase of the trial and that the violations were not harmless.

Both constitutional issues are raised by the State's procurement and use of the testimony of Raven "Snake" Frazier, a penitentiary inmate, whose testimony was arranged in part by Kenny King, a contract killer serving two life sentences. All of the evidence other than the testimony of Frazier was circumstantial; it placed the petitioner in the same general area where the victim disappeared and where she was murdered. The evidence that convicted the petitioner and supplied the only evidence in support of the heinous, atrocious, or cruel aggravator was the testimony of Frazier. That testimony was stated by this Court on direct appeal as follows:

> Raven "Snake" Frazier testified that he became acquainted with defendant at the state penitentiary and related a number of incriminating statements that defendant made to him. According to Frazier, defendant told him that he "put the lights" on the girl, told her that there was a sickness in her family, to lock her car and come with him; that he got "it" in the back seat and that it was so good that he took her out of the car, killed her and did it again; that she was not the angel that her boyfriend thought she was; that she "had had it one or more, two or three times."

*State v. Hartman,* 703 S.W.2d 106, 112 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986). The Court noted the matter of Frazier's credibility:

> Defendant presented witnesses who testified that Frazier would do anything to secure early release from the penitentiary and that he was an habitual liar. A former

District Attorney General testified about other attempts by Frazier to supply information in exchange for favorable treatment.

*Id.* at 112–13. The Court then summarized the corroborating evidence:

> The evidence in this case unerringly places defendant in the location from which Kathy disappeared, at the time she disappeared, with a demonstrated disposition for stopping motorists with the "blue lights" of the patrol car and a clear implication that, in the current vernacular, he was "looking for some action." From the testimony of Carol Estes and Jackie Jackson the jury could have found that defendant stopped Kathy across the street from the church where her car was found. His statements of his actions between 6:00 p.m. and 3:30 a.m., on November 16–17, 1981, leave ample time for the kidnapping and murder of the victim. His excuses of being lost and deliberately driving into the creek to account to the sheriff for his extended absence simply do not fill the hours between 9:30 p.m. and 3:30 a.m. and stand in this record without corroboration that has probative value.

*Id.* at 113.

On this appeal, the majority characterizes Frazier's testimony as the "linchpin" of the evidence connecting the petitioner with the crime. A more descriptive term could not be used. "Linchpin" is defined as something that serves to hold diverse elements together. It was Frazier's account of the petitioner's incriminating statements that transformed the State's case from surmise and conjecture to evidence of guilt.

Prior to any discussion between the prosecutors and the inmates regarding this case, Frazier had requested District Attorney General Hestle's help in obtaining release from prison. According to Hestle's testimony,

> Basically, he said he had information that he wanted to provide if our office could help as far as his sentencing went, and the information—he had no information that we were interested in at that time.

Frazier first offered, in exchange for Hestle's assistance, information about a drug dealer, which Hestle said was not useful. Later, Frazier offered information regarding a car theft operation, which Hestle also declined because "it was too old" and "couldn't help us at that point."

The crime was committed on November 16, 1981, the petitioner was arrested on September 21, 1982, and the trial was held on May 9, 1983. As the trial date approached, the State had no direct evidence connecting the petitioner to the crime. At that time, a third contact was made with the State's attorneys.

Because the testimony of the participants is less than precise, the chronology of significant events cannot with complete accuracy be determined from the record. The origin and development of the relationship between the prosecutors, with essentially an unsolved murder on their hands,[1] and the inmates, with testimony for sale or barter, has been described variously.

Judge Allen Cornelius, who wrote the lead opinion for the Court of Criminal Appeals, described it thusly,

> From the transcript of the evidentiary hearing, it is clear that these state officers entered into an agreement to pay inmate King to secretly tape an incriminating statement by Hartman and to furnish a witness to testify at the trial.

> It is amazing that after the tape did not materialize, due to an alleged malfunction of the recorder, these state officers accepted the uncorroborated testimony of Raven Frazier. In our opinion this effort by the state officers was a clear violation of the 1964 case of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, L.Ed.2d 246 (1964). The defendant had been indicted and had a lawyer, the state officers did not abide by the law while enforcing the law. *Spano v. People of New York,* 360 U.S. 315, 320, 79 S.Ct. 1202, 1205, 3 L.Ed.2d 1265 (U.S.N.Y. 1959). Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded

by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime. *Massiah, supra*[, 377 U.S. at p. 205, 84 S.Ct. at] p. 1202.

> This court rejects the State's argument that the statements made by the defendant, which formed the basis of Frazier's trial testimony, were uttered by the defendant prior to the time the prosecution accepted the offer of assistance. Apparently the state's brief writer misread the full transcript of Frazier's trial testimony and that of Generals McCutchen, Bobo, and Hestle at the evidentiary hearing. Mr. Hestle's testimony at the evidentiary hearing referred to a collect call he received in February 1983 from Frazier. After some uncertain[ty] Mr. Hestle settled on Frazier's words "I may be able to get some" meaning information. *See* Vol. IV, page 388, Record Petition of Post Conviction Relief. The State cites no authority in support of its argument. In fact, *Massiah, Henry, Moulton* and *State v. Berry,* 592 S.W.2d 553 (Tenn.1980) stand for a very strong policy that prosecutors and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Hartman v. State,* No. 01–C–01–9008–CC–00194, slip op. at pp. 9–11, 1992 WL 146756 (Tenn.Crim.App. June 30, 1992).

Judge John Byers agreed with Judge Cornelius that the sentence be vacated, but on a different ground, that the petitioner was denied effective assistance of counsel at the sentencing hearing. Judge Byers also reached a different conclusion with regard to the sequence of events. He described the development of the relationship as follows:

> It seems to me that King, a hired killer, realized he was in possession of a saleable product. King, who can best be described as an "old rat in the barn," knew the recorded voice of Hartman making incrimi-

---

**1.** The trial judge observed in his memorandum opinion that the case "raised a considerable hue and cry, not only because of the depraved rape and murder, but because of the involvement of the Sheriff's Department of Dickson County."

nating statements would be more valuable than the testimony of Snake Frazier, a convict whose credibility was not top of the line.

King then made his pitch to another former district attorney general to record Hartman making the incriminating statements.

I am satisfied King's proposal was to have Hartman repeat what he had already said prior to the entry into this scheme by any of the incumbent or previous district attorneys general who eventually became involved.

Although the conduct of these officials created a most unsatisfactory climate in this case, I do not find the one thousand dollars was paid to buy any testimony or to otherwise deny Hartman the right to counsel. It seems from this record the initial incriminating statements made to Frazier by Hartman were free of any taint and were properly admitted. I would, therefore, find, and do find, not that there was harmless error beyond a reasonable doubt in the introduction of this evidence, but that it was not error at all.

*Id.,* slip op. at pp. 1–2 (J. Byers, concurring).

Judge Robert Dwyer, dissenting, found no uncertainty with regard to the critical events, and supported his view that the sentence should be affirmed with a vivid description of the crime and a detailed criticism of the mitigating evidence, rejecting Judge Byers' finding of insufficient assistance of counsel at the sentencing hearing.

I am in complete agreement with Judge Byers when he finds that Raven Frazier's testimony was not tainted by the acts of the State officials. A review of this record reveals that Frazier had relayed his information to Mr. Hestle, the former Attorney General, before King, Fisher, McCutchen and Bobo started negotiations to tape Hartman's statements. The acts of the State officials, however questionable, did not produce any evidence that deprived the appellant of any constitutional right because no evidence was offered due to the malfunction of the tape-recorder. Therefore, I see no reason to reduce the sentence.

I agree with Judge Cornelius's finding a lack of merit in the appellant's allegation that his trial counsel was ineffective. Like Judge Cornelius, I find it inconceivable that an attorney of Mr. Quillen's experience would perform ineffectively under any circumstances. My review of the record leads me to conclude that the ineffective counsel issue is also meritless.

*Id.,* slip op. at p. 1 (J. Dwyer, dissenting).

The summary of the testimony made by the trial judge, the Honorable William H. Inman, sitting by designation, was as follows:

Hartman was returned to the main penitentiary sometime after his surrender of the patrol car. One of his cellmates was Raven Frazier, who testified that Hartman admitted the kidnapping, rape, and murder of Kathy Nishiyama. Another cellmate was Kenny King, described as a contract killer, who was serving two consecutive life sentences. He called the District Attorney's office and related that he had information about the Nishiyama murder, but would talk only to a District Attorney, Richard Fisher, whom he apparently trusted. Fisher went to the main prison and talked with King who told him that "Hartman would come to his cell and boast about the killing." King offered, for a thousand dollars of the reward money, to arrange a recorded interview with Hartman, in the presence of Frazier. All of this was reported by Fisher to the TBI, the FBI, and to the District Attorney of Montgomery County. The TBI agreed to pay the money; the interview was arranged, the hoped for words were spoken by Hartman, but the recorder malfunctioned. [Thus] it was that there was no taped corroboration of Frazier's testimony.

King refused to testify at the trial. His refusal, according to clear testimony, was adamant and absolute, because if he testified he became a "snitch" and his life would be in grave jeopardy, if not forfeited.

Despite the variations of facts supporting the various conclusions reached in these opinions, there seems to be a general consensus that in late winter or early spring of

1983, Frazier and his friend and fellow inmate, Kenny King, contacted two attorneys about the possibility of providing information in the case involving the death of Kathy Nishiyama. According to the trial judge's memorandum, the first contact with a state official regarding this case was Kenny King's call to Richard Fisher, an assistant district attorney in Nashville. King intimated that he might have information about the Nishiyama case. Subsequently, at King's request, Fisher met with King at the prison. But, prior to Fisher's visit to King at the prison, Frazier called Jack Hestle, the former District Attorney General for Montgomery County during whose tenure Nishiyama had disappeared, and vaguely and generally indicated that he might be able to get some information concerning a case in Montgomery County. Hestle testified that Frazier called him in February and said that "he had information, would I come to see him." Hestle further testified that when he met with Frazier at the prison, "he told me what case it pertained to and where he had gotten [the information] and that was all. He never said the details [on that visit]." Shortly after the revelation that King and Frazier were potential sources of information in the Nishiyama murder, Hestle met with his successor as district attorney general, Pat McCutchen, and McCutchen's assistant, Wade Bobo, to inform them of this development. As a result of the identification of King and Frazier as possible informants, additional meetings occurred between the two inmates and the attorneys representing the State. The dates on which these meetings occurred are uncertain on this record, but at least three contacts between the prosecution and the inmates were revealed at the post-conviction hearing.

At the first meeting, which was between Fisher and King, it was made clear that neither King nor Frazier would talk to the prosecutors unless a one thousand dollar "informant fee" was paid to King. After assurances were made that the one thousand dollars would be paid, King and Frazier separately spoke with Hestle and Bobo at a second meeting. It was at this second meeting that it was agreed that King, who refused to testify, would tape record the petitioner making incriminating statements with a third person present, obviously Frazier, who would then testify at trial and authenticate the tape. At a later meeting between the prosecutors and the inmates, Bobo was advised that the tape recorder had malfunctioned. At that point, according to Bobo, "all" the State had was "the person who was there when this was said"—Raven "Snake" Frazier.

The petitioner's attorney was notified that Frazier would be a witness. Frazier testified at trial, and eventually one thousand dollars was paid to King "for his performance" from personal funds of the State's attorneys, who later were reimbursed by the TBI. Hestle also performed on his agreement to assist Frazier in his efforts for early release from the penitentiary.

The majority of this Court acknowledges that any statements made by the petitioner or King or Frazier after they had been recruited by the State were inadmissible as the product of a violation of the petitioner's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution. *See United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *State v. Berry*, 592 S.W.2d 553 (Tenn.1980), *cert. denied*, 449 U.S. 887, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980). The majority, however, concludes that any violation of the petitioner's constitutional rights was harmless because Frazier's testimony was based upon statements made by the petitioner to Frazier prior to the State's efforts to have King and Frazier elicit incriminating statements from the petitioner. My reading of the proof of the post-conviction hearing and the record of the original trial, which was made a part of the record in the post-conviction proceeding, does not support that finding.

Prosecutors are practical lawyers. Why should these prosecutors, who certainly knew Sixth Amendment law, jeopardize evidence in hand essential to the conviction in a highly publicized murder case by requesting that Frazier obtain further information which clearly would be inadmissible under established law? The only practical explanation is

that the incriminating statements had not been made at the time the inmates became State agents. In my view, the testimony of the participants in this nefarious alliance supports this conclusion.

At the original trial, Frazier related the history of his contacts with the petitioner. He admitted that he first met Hartman one or two months before the trial began in 1983. This places Frazier's first contact with the petitioner, at the earliest, in late February or early March, 1983, which is when he and King first approached the State with the possibility that they might have evidence concerning the Nishiyama murder. I am convinced that the truth is found in Assistant District Attorney General Hestle's testimony at the trial, that, when Frazier contacted him in February of 1993, Frazier had said that he "may be able to get" information about the Nishiyama case and not that he "had" information. Hestle further stated he had told Frazier at that time, that providing information about the case "might help him" with his attempts to obtain parole.

Frazier testified that he went to the cell occupied by King and the petitioner at least daily, if not more frequently, for 10 to 15 days before the petitioner made any comment concerning the case. The first opening came when the petitioner made an innocuous remark that a deputy sheriff would testify for him at trial. Frazier related that he and King would "needle" the petitioner about the case and that, "a couple of more days" after his first remark, the petitioner expressed some concern that he could be linked to the case because he had been driving the patrol car near the area where Kathy Nishiyama's body was found. Finally, a day or so later, the petitioner made an incriminating statement when he replied to Frazier's remark that Nishiyama "seemed like a pretty good old girl" with the comment that "she wasn't the angel" her boyfriend thought she was. According to Frazier, it was only "about the last time" that Frazier had talked with the petitioner that, in response to Frazier's questioning, the petitioner related the details of how he tricked the victim into getting into the patrol car and how he had raped and killed her. Frazier testified that he then called Hestle to relate what he had heard. It is apparent from Frazier's own testimony and that of the witnesses at the post-conviction hearing that the petitioner's statements were made several weeks after February, 1983, which was, according to Hestle, when Frazier had first contacted him.

At the post-conviction hearing the four attorneys involved in having Frazier and King gather information from the petitioner testified. Although they stated that there was no difference between Frazier's testimony and what Frazier had told them before trial, they were unable to tell when they had first heard the facts to which he testified at trial. At the post-conviction hearing, Bobo admitted that he was unable to distinguish between the portions of Frazier's testimony that had been revealed at the second meeting and the parts that had come out later. He did not deny that the "specifics" of Frazier's testimony were developed at a late point in the case. Bobo also testified that the second prison meeting produced about three statements from Frazier showing the petitioner's involvement in the killing, but Bobo could not clarify what the statements were. All of the attorneys to whom Frazier spoke indicated that, during their earliest conversations with him, Frazier had been very vague about what he knew about the case and that it was King who had the more comprehensive knowledge of any statements.

Based upon this testimony, it is my opinion that the proof in this record does not support a finding that Frazier's testimony was derived from statements made by the petitioner before the inmates became State agents. At most, the proof shows only that the petitioner had made some statements to King and/or Frazier before they had agreed to work for the State. It does not establish that Frazier's testimony was solely or separately based upon those statements.

In determining whether the admission of a confession or statement obtained in violation of the right to counsel in contradiction of *Massiah* is harmless, it must be shown that the error was harmless beyond a reasonable doubt. *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824,

828, 17 L.Ed.2d 705 (1967). The question for this Court to determine is whether the verdict actually rendered was "surely unattributable" to the error. *Sullivan v. Louisiana,* 508 U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). The State bears the burden of proving that an error passes muster under this standard. *Chapman,* 386 U.S. at 23, 87 S.Ct. at 828. Based upon almost any reasonable version of the relationship between the State's attorneys and the inmates, the State has failed to carry this burden.

The majority has also rejected the petitioner's argument that his due process right to a fair trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) was violated. The majority acknowledges that the State has a duty to disclose, upon request, evidence that may be used to impeach a witness. *Giglio,* 405 U.S. at 155, 92 S.Ct. at 766. Information concerning any agreement or understanding reached between witnesses and the State must be disclosed under this rule, *id.,* even evidence of agreements that are not on a quid pro quo basis. *See Bagley v. Lumpkin,* 798 F.2d 1297, 1302 (9th Cir.1986). Monetary compensation or a reward given for the witness's assistance in a case falls under this rule of disclosure. *Id.* at 1301.

The petitioner contends that his right to due process was violated by the State's failure to inform his counsel that the State had paid $1,000 for Frazier's testimony. Both the trial court and the majority of this Court have found that the payment of the $1,000 to King was immaterial to Frazier's credibility as a witness. Both rely upon the fact that the money was paid entirely to King's account. From this they conclude that the payment had no relation to Frazier's testimony and therefore does not meet the requirement of materiality set forth in *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

This conclusion on the part of the majority ignores clear and undisputed evidence in the record that the $1000.00 payment to King was the prerequisite for Frazier's informing the State of the petitioner's statements. At the post-conviction hearing, Assistant District Attorney Wade Bobo testified that before either King *or Frazier* would talk with the State "*they* would get ... an informant's fee or something of $1,000 before we would be able to talk *to them* about it. Before *they* would converse with us about their conversation." He repeated, "I just know ... either at that time [of the first meeting with Hestle in late winter 1983] or shortly thereafter, I was made aware that $1,000 had to be paid before *either of them* would tell us anything about the conversations they had with Hartman." Again, when asked who had brought up the subject of the $1,000 "reward," Bobo stated, "Well, we were already aware that was going to be one of the conditions before they even—we were aware of that—I was aware of that before that trip down there. I was aware that $1,000 had to be promised *before either Frazier or King* would even talk to us and one of the first things that—as I recall, that *both of them* wanted to inquire— *are we—are we promised* that the $1,000 for the right to talk to *us* or the privilege to talk [to] us, will it be paid, and we had already discussed that and we did give *them* that assurance." At another point in his testimony, Bobo again made it clear that both men required money before they would even talk to the State: "Yes, they talked—both of them talked to us about—yes, they kept their end, as far as—that was the only thing—they had to have the money promise *before either of them would talk to us.*" Bobo confessed that "had we not promised the 1,000 bucks, *neither of them* would have talked to us." To insist that there is significance in the money being delivered to King's prison account rather than Frazier's is to deny the realities of prison culture, or even "outside" culture, for that matter.

This proof shows that Frazier refused even to talk to the State's representative about the petitioner's statements unless King received $1000.00. That Frazier refused to speak with or to provide any information to the State until payment had been made to some third person was seriously damaging to his credibility and highly material. I also consider it material that once the State had agreed to pay King and the plan had been

devised to record the petitioner's incriminatory statements to Frazier, the tape recorder did not work. Both McCutchen and Bobo testified that they had serious doubts about Frazier's credibility and that the tape recording was, in part, a way to confirm the truthfulness of his allegations. All of this information would have materially affected the credibility of Frazier's testimony and should have been supplied to the petitioner under the principles of *Brady, Giglio,* and *Bagley.* In my opinion, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different;" therefore, confidence in the outcome of the petitioner's trial has been undermined. *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

The petitioner also complains that the State failed to inform him of the promises by the State's attorneys to testify on Frazier's behalf at an upcoming hearing before the parole board. At trial, Frazier testified that the only promise he had received from the State in return for his testimony was the promise of protection from fellow inmates. Frazier denied any promise by the State to assist him in seeking clemency, although Hestle admitted his efforts on Frazier's part but denied any connection between them and Frazier's testifying at the petitioner's trial. The record on post-conviction, however, shows that while District Attorney Pat McCutchen, and his assistant, Wade Bobo, did not directly promise to support Frazier's attempts to obtain clemency, Hestle had assured Frazier that they would support him in his appearance before the parole board.

Q. I don't guess you [Bobo] told Snake Frazier prior to the trial that you would appear on his behalf before the parole board, did you, sir?

A. I believe Mr. Hestle is the one who did tell him—I don't know the time element involved, at some stage that we—that he was convinced that the District Attorney would inform the board of his cooperation and his testimony in the Nishiyama trial.

Q. How would Mr. Hestle have known that unless he got it from you or General McCutchen?

A. He assured him that we would testify.

Q. Did you tell Mr. Quillen [petitioner's counsel] at any time prior to this trial that y'all had entered into an agreement through Hestle that you in fact would go in front of the parole board and you would in fact try to assist Raven Frazier in getting out of prison?

\* \* \* \* \* \*

A. No, we didn't tell Mr. Quillen that. That wasn't the incentive though to get him to talk to us anyway, Mr. Hestle had just assured him that we would tell the truth, we would go before the parole board and we did that. I did that.

In fact, McCutchen wrote a letter on Frazier's behalf and Bobo appeared as a witness for Frazier at that proceeding. Both mentioned his assistance in the petitioner's case. While the omission by the State in fulfilling its duties of disclosure concerning the prosecutors' efforts in Frazier's parole proceedings might not by itself require reversal, inasmuch as the jury was made aware of Frazier's upcoming parole hearing and his hopes in this regard, when considered in light of the State's other omissions in this case, this failure to disclose and the appearance of deliberately using a third party, Hestle, as a technicality to insulate itself from the need for disclosure was a violation of the prosecutors' obligation to respect those rules designed to protect the rights of the accused.

During Frazier's cross-examination, the prosecution also allowed Frazier to misrepresent the facts concerning his relationship with the State. Frazier denied any deals other than a promise of protection, when he had promises, albeit indirectly through Hestle, that the prosecution would support him before the parole board. He also did not disclose that the State had promised to pay King $1000.00 for his testimony and denied asking the State for any favors. When asked on cross-examination whether "at any time" when he had talked with either McCutchen or Bobo or Hestle they had "made any written memoranda or any tapes" of what he had told them, Frazier had replied, "Not to my knowledge." While technically correct, the answer is appallingly disingenuous in light of

both Frazier's and the State's knowledge of the attempt to tape record the petitioner's statements.

For these reasons I would find the petitioner's conviction was obtained in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution and would vacate his conviction as well as the sentence and remand this case for a new trial as to both guilt and sentence.

For the record, I join Judge Cornelius in his condemnation of the State's performance in this case.