IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs October 30, 2001

**STATE OF TENNESSEE v. STEPHEN GREENE**

**Direct Appeal from the Circuit Court for Blount County**
**No. C-10844, C-10845    D. Kelly Thomas, Judge**

_____

**No. E2000-02616-CCA-R3-CD**
**April 18, 2002**

The defendant appeals his convictions of rape of a child and incest. We conclude that the State did not improperly bolster the victim's testimony on direct examination. In addition, the defendant was not denied his constitutional right to confront witnesses against him or to an impartial jury when the trial court denied his request to question a non-witness about an alleged statement made out-of-court. Furthermore, the State was not obligated to disclose the contents of a Department of Human Services file requested by the defendant under Brady v. Maryland or Rule 16 of the Tennessee Rules of Criminal Procedure. We must, however, reverse the defendant's conviction of incest and remand for a new trial on Count Two based upon the State's failure to make a proper election for the offense. We, therefore, affirm the rape of a child conviction, reverse the conviction of incest, and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and JAMES CURWOOD WITT, JR., JJ., joined.

Kevin Wayne Shepherd, Maryville, Tennessee, for the appellant, Stephen Greene.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Kirk E. Andrews and Edward P. Bailey, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Stephen Greene, was indicted by a Blount County Grand Jury in Count

One for a violation of Tennessee Code Annotated section 39-13-522, rape of a child, a Class A felony; and in Count Two for a violation of Tennessee Code Annotated section 39-15-302, incest, a Class C felony. Count One alleged that the child rape – the rape of a "victim less than thirteen (13) years of age," Tennessee Code Annotated section 39-13-522 – occurred on or about December 25, 1994. Count Two alleged incest violations occurring between March 1995 and August 1997. The defendant was tried by a jury and found guilty of the offenses charged in the indictment on both counts. The trial court sentenced the defendant to serve twenty-five (25) years for the rape of a child conviction and six (6) years for the incest conviction. The sentences were ordered to be served consecutively, amounting to an effective sentence of thirty-one (31) years. Following the trial court's denial of the defendant's motion for a new trial, he filed a timely notice of appeal.

In this appeal, the defendant raises the following four issues: (1) whether the trial court improperly allowed the victim to testify about prior consistent statements during direct examination, (2) whether the defendant's request to question the victim's sister about statements alleged to have been made outside the courtroom, but in the presence of potential jurors, was improperly refused, (3) whether the State improperly withheld exculpatory information, requested by the defendant, about the prior sexual conduct of the victim, and (4) whether the State failed to make a proper election for the offense in Count Two.

## FACTS

The victim, T.M., eighteen at the time of the defendant's trial, testified that in December of 1994 she was twelve years old and lived with her mother, step-father, sister, and brother. The defendant was her step-father. The victim testified that the defendant began forcing her to have intercourse with him on December 24, 1994. That Christmas Eve, the victim's mother, Kimberly Greene, came into the room where the victim was sleeping, woke her, and said that the defendant needed to speak with her. The victim asked if it could wait until the next day. Her mother replied that it could not, and the victim followed her mother to the master bedroom. When the victim entered the room, the defendant instructed her to sit on the bed where he was lying underneath the covers. She complied, and the defendant then instructed her to lie down on the bed. Again, she complied, and the defendant pulled the covers out from underneath her and put them on top of her. At this time, the victim's mother sat down on the bed and placed the victim's head in her lap. The defendant removed the victim's underwear and threw them in the floor. He then tried to position her legs up on his shoulders. The victim said that she refused to move, whereupon the defendant pinched the inside of her legs so that she would loosen up. When she did, the defendant forced his penis inside the victim's vagina. The defendant continued to have intercourse with the victim for thirty to forty-five minutes, while the victim's mother stroked her head and told her to think about Christmas and the presents she would be receiving. When the defendant stopped having intercourse with the victim, he told her to get her clothes and get out of his face.

After gathering her clothes, the victim went to the bathroom where she discovered that

she was bleeding.  The victim's mother followed her into the bathroom and gave her a sanitary napkin to put in her underwear.   Her mother washed her face and told her not to worry about the bleeding.  Afterwards, the victim returned to her own bed.  The next morning, the victim's mother told her not to tell anyone what had happened or her sister and brother would be taken away and her mother would get in trouble.

The victim testified to no further assaults by the defendant prior to her thirteenth birthday. According to the victim's testimony, the defendant did not force her to have intercourse again until March 12, 1995, her thirteenth birthday.  The victim remembered that she received a pink ice ring and a Tigger watch for her birthday.  At some point during the day, the victim stuck her finger in the icing on her birthday cake, which angered the defendant.  Later that night while her mother was sleeping, he went into the victim's room and got her out of bed.  He instructed her to follow him to the living room.  Once in the living room, the defendant pushed the victim down on the couch, took her underwear off and forced her to have intercourse.  The victim cried out, but the defendant put his hand over her mouth.  For the next thirty-minutes he had intercourse with the victim, stopping a few times to "lick his fingers and clean his penis off and then put it back inside [the victim] again."   After the defendant was finished, the victim picked up her clothes and went back to bed.  The next day, the victim asked the defendant what would happen if she got pregnant, and he replied that he would just say it was someone else's child.  The victim also told her mother what had happened the previous night.

According to the victim, the defendant continued to have sex with her two or three times a week between March of 1995 and August of 1997.  She recalled that the defendant forced her to play "begging sex games" during that period.  Specifically, the victim testified that the defendant forced her "to ask him if he wanted some p***y."  If he said no, the victim was required to keep begging the defendant.  She recalled that on one occasion, the defendant repeatedly said no and did not have sex with the victim.  However, on other occasions he would eventually have sex with the victim.

The victim also testified that the defendant forced her to have anal sex.  Around Mother's Day in 1996, the defendant forced the victim to have anal intercourse with him on the couch. This was the first of two times that the defendant had anal intercourse with the victim.  The only other time occurred in the victim's bedroom floor in front of the chest-of-drawers.  The victim recalled that the defendant did not put any lubrication on his penis before anally penetrating her, and it hurt, causing her to cry.  Because of the pain, she tried to get away, and the defendant pushed her head up against a drawer to prevent the victim from moving away from him. Afterwards, she went to the bathroom and discovered "blood all over the place."

The defendant also forced the victim to perform fellatio.  The victim testified that the defendant came and got her out of bed on one occasion and took her to his room.  Her mother was sleeping on the couch that night.  The defendant told the victim he wanted her to "suck his d**k."  The victim responded that she did not want to and did not know how.  At which point, the defendant pushed her head down and put his penis in her mouth.  He instructed her to close

her mouth around his penis and then grabbed her hair and pushed her head up and down on his penis. This lasted about five minutes. The victim remembered that she ran to the bathroom gagging but did not vomit. The victim also testified that the defendant was drunk every time he had sex with her, except for one time. That time, she recalled trying to distract the defendant by asking him "if he would do this to his own daughter," to which the defendant responded, "you are not my daughter."

The victim also described the last time the defendant forced her to have intercourse. In the summer of 1997, the victim began dating a nineteen-year-old young man named Jason Parrott. According to the victim, the defendant did not like Mr. Parrott because he was dark-skinned. However, she also admitted that Mr. Parrott was the member of a gang. Prior to August of 1997, the defendant told the victim that she was not allowed to see Mr. Parrott. However, on August 20, 1997, the defendant saw the victim hugging and kissing Mr. Parrott at the school bus stop. That evening while the victim's mother was at work, the defendant twice forced the victim to have intercourse on the couch. After the second time, he told her he was finished with her, and she went to the bathroom to take a shower. While she was in the shower, the defendant came in the bathroom and pulled the shower curtain open. The victim said, "I thought you were done with me," and the defendant responded, "I lied." According to the victim, he turned her around, bent her over and had sex with her again, slamming her head into the shower wall. The next day at school, the victim told a friend, Kisha Finger, that the defendant had been having sex with her. Ms. Finger directed the victim to a guidance counselor, who contacted the authorities. The victim related to the authorities that the defendant had been raping her for over two years. Initially, she did not include any information about her mother's involvement in the incident that occurred on December 24, 1994. Within days, the victim, her mother, and her siblings were moved out of the defendant's home and into an apartment. A few months later, the victim told the authorities about her mother's involvement because her mother was continuing to see the defendant, and she thought her mother was going to move back in with him. Her mother was subsequently arrested for her participation in the rape of the victim.

The victim's friend, Kisha Finger, and the guidance counselor, Kay Buckley, both testified for the State. Ms. Finger testified that the victim was crying more than usual in Teen Sports class on August 21, 1997. Ms. Finger asked the victim what was wrong, and the victim responded, "My stepfather is raping me." Ms. Finger immediately took the victim to the guidance counselor's office. Ms. Finger did not ask the victim about the details of the abuse because she felt it was important to get the victim to the guidance counselor as soon as possible. She did, however, recall that the victim told her it had been going on for a while. Ms. Finger also testified that she remembered the victim dating Mr. Parrott after August 21, 1997, but not before.

Ms. Buckley testified that she was a school counselor at the school the victim attended in 1997. She verified that Ms. Finger brought the victim to her office. She recalled that the victim was crying and appeared to be very upset. Ms. Buckley did not ask the victim specific questions but allowed the victim to tell her what she wanted. According to Ms. Buckley, the victim told

her that her step-father, the defendant, had been having sexual intercourse with her. The victim also told her that it had happened several times and had been going on since the victim was in middle school. Ms. Buckley responded by calling the Department of Human Services.

The State also called Dr. Jan Bishop to testify about the results of a physical examination that Dr. Bishop performed on the victim. Dr. Bishop is an expert in the area of pediatric sexual abuse. She performed an examination of the victim's genitals in September of 1997. Dr. Bishop testified that she interviewed the victim prior to performing the examination pursuant to her standard procedure. During her discussion with the victim, the victim told Dr. Bishop that her stepfather, the defendant, had vaginal and anal intercourse with her two or three times a week beginning when she was thirteen. The victim told her that the defendant had anal intercourse with her once or twice and forced her to perform fellatio once or twice. The victim also indicated that the defendant was usually drunk when he had intercourse with her. The intercourse usually occurred in the living room or the defendant's bedroom. The victim also denied ever having sexual intercourse with anyone other than the defendant.

During the physical examination of the victim's external genitalia, Dr. Bishop found that the victim's hymen was torn in two places. She did not perform an internal examination of the victim's vagina because the victim was fearful of the procedure. From what Dr. Bishop was able to examine inside the victim's vagina, it appeared to be normal. Dr. Bishop also found that one side of the victim's rectum had some scarring. Dr. Bishop opined that the tears in the hymen and the rectal scarring were caused by blunt force trauma. On cross examination, Dr. Bishop admitted that it was possible for a virgin to have a torn hymen, although it is unusual especially to have more than one tear. She also admitted that she did not question the victim about whether she had ever had any problems with constipation or straining, which could also be a cause of rectal scarring. Finally, Dr. Bishop noticed that the vital signs recorded for the victim were identical to those recorded for another patient examined the same day. She indicated that she must have dictated from the wrong chart. She explained that the vital signs are taken by a nurse and recorded on an index card, but the rest of the examination is performed and recorded by her.

The defendant testified on his own behalf and denied ever having sexual relations with the victim. He described his relationship with the victim as kind of rocky. In the summer of 1997, however, their relationship got worse in his opinion because she began to rebel, and he had to set and enforce more rules. The defendant remembered that the victim stayed grounded quite a bit during that time because he caught her "sneaking around seeing this older boy." The defendant was referring to Jason Parrott. According to the defendant, the victim told him that Mr. Parrott was sixteen-years old, when he was, in fact, nineteen-years old. The defendant also discovered that Mr. Parrott had a criminal record and was a member of a gang. The defendant told the victim that she was not allowed to continue dating Mr. Parrott. As a result, the victim was very angry with the defendant and the two "were at each other's throats quite a bit." The tension escalated in August of 1997 when the defendant told the victim he was going to drive her to and from school to prevent her from sneaking around with Mr. Parrott. The defendant also threatened to send the victim to a private Christian school after he found her at the school bus

stop with Mr. Parrott. According to the defendant, the victim was forty-five minutes late coming home from the bus stop on August 20, 1997, so he went to look for her. He found her at the bus stop with Mr. Parrott. He told Mr. Parrott to stay away from the victim and made her get in the car and ride home with him. The victim remained angry with the defendant the remainder of the day and stayed in her room. The next morning, the defendant drove her to school instead of allowing her to ride the bus. That afternoon, someone from the Department of Human Services and Detective Graves of the Maryville Police Department arrived at his home and informed him that the victim had accused him of raping her. Thereafter, the victim, as well as the defendant's wife and other children, were moved from the defendant's home to an apartment.

Denise Greene also testified for the defense. Ms. Greene is the wife of the defendant's brother and spent several nights a week visiting the defendant and his wife in their home between 1994 and 1997. During this time, Ms. Greene did not notice anything unusual about the defendant's or the victim's behavior which would suggest that the defendant was abusing the victim sexually or otherwise. According to Ms. Greene, the victim was always very disrespectful to her mother, and the defendant was the parent who "put his foot down" when the victim misbehaved. Beginning in spring of 1997, however, she noticed a change in the victim's behavior. She observed several heated arguments between the defendant and the victim. The arguments often culminated in the victim retreating to her bedroom and slamming her bedroom door or taking her radio and storming outside the house. Ms. Greene recalled that the victim's mother explained to her that the defendant did not approve of a boy the victim was dating at the time. The victim's mother told Ms. Greene that the defendant asked to meet Jason Parrott because the victim was spending a lot of time on the phone with him. Upon meeting Mr. Parrott, the defendant apparently thought that Mr. Parrott "looked kind of rough" and checked into his background. The defendant discovered that Mr. Parrott was in a gang and had a police record. According to Ms. Greene, the problems between the victim and the defendant escalated when the defendant told the victim she could not date Mr. Parrott. She remembered that the victim got angry and "ran off" a couple of times shortly before she made the allegations against the defendant. Ms. Greene and her husband helped to locate the victim on these occasions. When asked about her opinion of the victim's truthfulness, she responded that she did not find her to be truthful. She also noted that there was a television movie about two children who falsely accused their parents of sexually abusing them, which was broadcast a week before the victim accused the defendant of raping her. She remembered discussing the program with the victim's family and that the victim acknowledged that she had seen the program.

Angela Cunningham testified that the victim was living with her and her husband shortly before the trial. Ms. Cunningham explained that her husband was the brother of the victim's mother, Kimberly Greene. The victim had lived in the homes of two other relatives before coming to live in Ms. Cunningham's home. According to Ms. Cunningham, the reason that the victim had moved from home to home was because she "had a tendency to run off." Ms. Cunningham also testified that she had problems with the victim being untruthful.

On rebuttal, the State called Jason Parrott, who was incarcerated at the time of the trial, to

testify about the defendant threatening him with a gun.  Mr. Parrott stated that in August of 1997, the defendant told him to stay away from the victim and displayed a handgun.   Mr. Parrott was alone at the school bus stop when the incident occurred.  Mr. Parrott also admitted that he ran away with the victim for over a week in September of 1997 but denied ever having sexual contact with her.  He also admitted to running away with another minor girl in January of 1998.

Sam Headrick also testified on rebuttal.  He claimed that the defendant used to get drunk with him frequently between 1992 and 1994.  Mr. Headrick further alleged that he observed the defendant strike the victim when she was a very young child in a manner that he believed to be abuse.  However, he never reported such an allegation to the authorities.

## ANALYSIS

The defendant alleges that the trial court erred by allowing the State to question the victim about prior consistent statements during its direct examination; that the trial court erred by denying the defendant's request to question the victim's sister about prejudicial statements that she allegedly made in the presence of potential jurors; that the State improperly withheld information about the victim's prior sexual conduct after it was specifically requested by the defendant; and that the State failed to make a proper election for the offense of incest in Count Two.

### Prior Consistent Statements

The defendant argues that the State improperly bolstered the victim's testimony by utilizing a prior consistent statement when the prosecutor asked the victim on direct examination if she had ever told anyone about the sexual abuse by defendant.  We disagree.  After the victim testified that the defendant had sexually abused her for a period of years, the State asked her, over the defendant's strenuous objection, whether she had ever told anyone about the abuse, and if so, who she told, and why she told them.  The victim responded that she told one friend about the abuse every year until the instant charges were brought against the defendant, beginning when she was in the seventh grade.  She also gave the name of each person, all of whom were classmates.  She explained that she felt like she needed to tell someone about the abuse but was afraid to tell an adult because the defendant had threatened to harm her mother and siblings if she told anyone.

The defendant alleges that the victim's testimony about such prior consistent statements during direct examination was improper because the victim's credibility had not yet been attacked.  The defendant correctly points out that a witness's prior consistent statements are not admissible unless the witness's credibility has been attacked to the extent that the witness's testimony needs rehabilitating.  State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988).  As such, it would have been error for the State to introduce the contents of the victim's prior

consistent statements during the direct examination of her because she was the first witness and, therefore, could not possibly have been attacked at that point. However, we need not discuss the ramifications of such an error, because the victim was only questioned about whether she had made prior consistent statements, to whom, and why. She was not questioned about the contents of the statements.

Although the relevance of whether the victim, an unassailed witness at the time, made prior statements consistent with her trial testimony is questionable, see Tenn. R. Evid. 402, the admissibility of evidence is a matter within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). We, therefore, conclude that by affirming that she had made consistent statements to one friend a year, the victim was not improperly allowed to bolster her testimony, as might have occurred if the contents of the prior statements had been related to the jury. This issue is without merit.

**Alleged Prejudicial Statements**

The defendant next asserts that he should have been allowed to question the victim's sister, Brandy Greene, about alleged statements that she made in the presence of potential jurors. The day after the jury was impaneled, defense counsel advised the trial court that the defendant's roommate received a telephone call the night before from one of the members of the jury pool, Bill Schott. Mr. Schott was an acquaintance of the defendant's roommate and had not been selected as a juror. According to Mr. Schott, he and other members of the jury pool were on the elevator with the victim's sister, when he heard her talking about the case, naming the defendant and Kim Greene. The trial court advised the State to talk with the victim and her sister to ascertain what, if anything, had been said by either of the girls in the presence of potential jurors.

After learning that the victim and her sister had an argument in a public area of the courthouse building the day before, the State asked the girls to remain in the District Attorney's waiting room for the remainder of the trial. According to the State, the girls denied having a conversation on the elevator and claimed that the argument they had was about a matter collateral to the case. In addition, the trial court questioned the jurors about whether they had heard anyone talking about the case the day before while they were "going or coming at lunch, recesses, or whatever, hear anyone talking about this case outside of this courtroom at any time - you know, at the snack bar, in the elevator, in the hallway, in the parking lot, anywhere?" There was no response from the jurors. The trial court then asked if there was any "mention of [the defendant] or Kimberly Greene, or [the victim], or [any] talk about the case whatsoever?" The jurors all shook their heads no. Thereafter, the trial court ended the inquiry and refused the defendant's request to further question the victim's sister under oath about the alleged comments on the elevator. The trial court stated that "if none of the jurors heard anything, whether she said it or didn't doesn't make any difference to me."

The defendant contends that he was denied his constitutional right to confront and cross-

examine his accusers, as well as the right to a fair and impartial jury. Specifically, he argues that the jury's initial failure to respond to the trial judge's questions and the eventual head shaking was unclear. In other words, the jury's response or lack thereof was insufficient to demonstrate that none of the jurors had overheard prejudicial information about the case. The defendant also maintains that he had a constitutional right to confront the victim's sister about the alleged comments because she was acting as a witness against him by making such comments in the presence of the jury pool.

The Sixth Amendment of the United States Constitution guarantees a defendant the right to confront witnesses against him at trial. Similarly, article I, section 9 of the Tennessee Constitution and Tennessee Code Annotated section 40-17-105 guarantee a defendant's right to meet the witnesses face-to-face. Essentially, the purpose of the Confrontation Clause is to protect the defendant's right of cross-examination. Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 2082 (1985) (citations omitted). Where a defendant is unable to cross-examine a hearsay declarant about his or her statement, which is admitted for substantive purposes at the defendant's trial, such admission runs afoul of the Confrontation Clause. Bruton v. United States, 391 U.S. 123, 134-35, 88 S. Ct. 1620, 1627 (1968).

In the instant case, the alleged prejudicial statements by the victim's sister were not admitted into evidence. In fact, it appears that none of the jury members even heard the alleged out-of-court statements. Furthermore, the victim's sister was never called as a witness by either the State or the defense. As such, the defendant had no constitutional right to question her before the jury about statements that were allegedly made out-of-court. Thus, the defendant was not denied his constitutional right to confrontation of witnesses.

Turning to the defendant's argument that his constitutional right to an impartial jury was violated, our review of the record does not support the defendant's position. We initially note that juror qualification rests within the discretion of the trial court and the trial judge's "finding a juror to be qualified will not be disturbed on review except on the clear showing of an abuse of discretion." Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). Rule 24(b) of the Tennessee Rules of Criminal Procedure provides that if the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case." In the instant case, the trial judge asked the jurors "has anyone on the jury gotten any information about this case from any other source since we recessed yesterday? Or been contacted by anyone about this case? Yesterday while we were up here selecting the Jury, did anybody . . . hear anyone talking about this case outside of the courtroom . . . anywhere?" None of the jurors responded that they had received such information. The trial judge then clarified that none of the jurors had heard anyone talking about the case by restating, "No mention of Mr. Greene or Kimberly Greene, or T.M., or no talk about the case whatsoever?" All of the jurors responded by shaking their head no. The defendant has not shown that any juror was exposed to potentially prejudicial information. Absent a showing of prejudice, we have no basis on which to overturn the trial court's decision, and we, therefore, find no reversible error in connection with the court's decision in this regard. This issue is

without merit.

## Suppression of Exculpatory Information

In his next point of error, the defendant asserts that his right to a fair trial was adversely affected by the State's failure to disclose information specifically requested by the defendant about the prior sexual conduct of the victim with persons other than the accused. It appears from the record that the defendant requested any known evidence regarding prior sexual activity of any nature involving the victim with any individual other than the defendant, including allegations made in Sevier or Blount County that the victim had molested other children. In addition, the defendant requested the contents of any reports, interviews, or information gathered by Nita Robertson or any other employee of the Department of Human Services, which might lend itself to exculpate the defendant. These requests were contained in a motion to produce all exculpatory material information filed in April of 1999.

### Factual Background

At the hearing on the motion for new trial, the defendant discovered during the testimony of Amy Galyon, a former Department of Human Services ("DHS") employee, the existence of a file containing information that the victim had been accused in 1995 of sexually abusing two younger cousins. The defendant had the DHS file admitted as an exhibit at the hearing and was able to view the contents of the file for the first time. Among other things, it contained a report prepared by Ms. Galyon indicating that the Department of Human Services "received a report alleging that [the victim] had allegedly sexually abused her cousins and may be sexually abused herself . . . ." The report was essentially a risk assessment worksheet completed after Ms. Galyon met with the victim in her home to discuss the allegations. It appears from the report that the visit was in September of 1995, and that Ms. Galyon spoke with the victim, her sister, her mother, and the defendant. Ms. Galyon also indicated that the defendant and his wife "were very cooperative and appropriate with their children." There was nothing in the file to suggest that Ms. Galyon was concerned that the victim was being sexually abused by the defendant, despite the earlier mention in the report that the victim "may be abused herself." In contrast, Ms. Galyon consistently referred to both the defendant's and the victim's behavior as appropriate. Finally, a typed case summary reveals that Ms. Galyon "went over good/bad touches and explained that no one should touch [the victim] and [she] shouldn't touch anyone else." The victim agreed and was "very appropriate."

Detective David Graves, the officer leading the investigation of the defendant, learned of the existence of the DHS file and the allegations against the victim in February of 1998. Detective Graves had been contacted by Lisa Tucker, the mother of the children that the victim allegedly abused, and informed that the victim had sexually molested Ms. Tucker's children. At the time, Detective Graves indicated that he felt like Ms. Tucker was trying "to stir up a lot of garbage." He did, however, report the information to the District Attorney's Office shortly thereafter. Therefore, the State had knowledge of the allegations against the victim and access to

the DHS file when the defendant filed his motion requesting such information in April of 1999.

The State defends its failure to disclose the existence of the file and its contents to the defendant on the grounds that the information contained in the file was not admissible and, therefore, irrelevant. According to the State, the file contained information that the victim had been accused of fondling a seven-year-old female cousin and of engaging in oral sex with a twelve-year old male cousin. There was nothing in the file to suggest that the victim had been penetrated vaginally or rectally. The State correctly points out that such evidence would not have been admissible at trial under Rule 412 of the Tennessee Rules of Evidence. The provisions of Rule 412 applicable to this type of evidence state in pertinent part:

> (c) Evidence of specific instances of a victim's sexual behavior is inadmissible
>     unless . . . the evidence is:
>     (1) Required by the Tennessee or United States Constitution, or
>     . . .
>     (4) If the sexual behavior was with persons other than the defendant,
>         [and is offered]
>         (i) to rebut or explain scientific or medical evidence, or
>         (ii) to prove or explain the source of semen, injury, disease, or
>             knowledge of sexual matters . . . .

Tenn. R. Evid. 412(c). Because there is nothing in the file to rebut the medical evidence of vaginal lacerations and rectal scarring, the information would not have been admissible. The State further argues that the defendant had independent knowledge that the victim had been accused of sexually molesting her cousins.

## Analysis

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution affords all criminal defendants the right to a fair trial. The United States Supreme Court, in Brady v. Maryland, held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963); Hartman v. State, 896 S.W.2d 94, 101-02 (Tenn. 1995). The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 469 S.W.2d 533, 534-36 (Tenn. Crim. App. 1969).

The Tennessee Supreme Court has held on several occasions that in order to establish a Brady violation, the defendant must show the existence of four elements: (1) that the defendant requested the information (or that information was obviously exculpatory); (2) that the State withheld the information; (3) that the withheld information was favorable; and (4) that the withheld information was material. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

The defendant bears the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

Without question, the first two requirements have been met. Almost a year before the defendant's trial, defense counsel made a motion specifically requesting the evidence that was suppressed by the prosecution. Furthermore, as the State concedes in its brief, the information was reported to the Tennessee Department of Human Services, a state agency, and thus, was deemed to be in the State's possession. See Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977) (holding that the prosecution is required to disclose information that is possessed by or under the control of the prosecution or another governmental agency). The more difficult issues are whether the evidence is both favorable and material to the defendant. The Tennessee Supreme Court has held that favorable information "may consist of evidence that 'could exonerate the accused, corroborate the accused's position in asserting his innocence, or possess[ ] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation . . . .'" Johnson, 38 S.W.3d at 56 (quoting Marshall, 845 S.W.2d at 233). In other words, information is favorable if it "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Johnson, 38 S.W.3d at 56-57 (citations omitted).

Based upon our review of the record, we conclude that the information contained in the DHS file was favorable to the defendant. The information contained in the 1995 DHS report corroborates the defendant's position that the victim made up the allegations against him. The report reveals that the Department of Human Services had information that the victim was accused of sexually abusing two minor cousins and that the victim had possibly been abused herself. Furthermore, the report indicates that a DHS worker came to the defendant's home to investigate the allegations during the time that the defendant was reportedly raping the victim two to three times a week. The DHS worker met with the victim, the defendant, and the victim's mother and reported that the defendant and his wife "were very cooperative and appropriate with their children." Additionally, no increased risk or intermediate risk of sexual abuse was indicated in the risk assessment report. The victim was reported to be the "benchmark" in every category except for age and developmental status. In that category, she was ranked as "low risk." Additionally, the worker's typed notes revealed that she went over good touches and bad touches with the victim. In short, there is no indication that the worker sensed that anything was amiss in the home.

The defense theory was that the victim made up the allegations against the defendant because she wanted to get the defendant out of the house so she could date Jason Parrott. In support of his position, the defendant pointed to the fact that the victim never reported the abuse to an adult, even though her school offered classes that addressed the issue of sexual abuse. In response, the State presented evidence that the victim did not take the classes and that parental permission is required for participation in such a class. The defendant also presented the testimony of several people who were around the family during the time that the defendant was

alleged to have been abusing the victim. The witnesses testified that they did not observe anything unusual about the defendant's relationship with the victim. However, the State attacked those witnesses as biased because of their relationship to the defendant. Viewed in light of the defendant's arguments at trial and the State's responses to such arguments, the information contained in the DHS file "furnishes corroboration of the defendant's story" and "bolster[s] the defense['s] case against prosecutorial attacks." As such, the information satisfies the requirement of being favorable to the defendant. Johnson, 38 S.W.3d at 56-57.

Although the defendant has established that the State withheld favorable evidence, we must, nevertheless, conclude that the defendant's claim fails because he has failed to demonstrate by a preponderance of the evidence that the information was material. The Tennessee Supreme Court has established that evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Edgin, 902 S.W.2d at 390 (adopting the United States Supreme Court's materiality standard set out in Kyles v. Whitley, 514 U.S. 419, 435 n.8 (1995)). Despite the use of the word "probability" in our State's cases,

> the test of materiality is not whether the defendant would more likely than not have received a different verdict had the evidence been disclosed. Nor is the test of materiality equivalent to that of evidentiary sufficiency, such that we may affirm a conviction . . . when, "after discounting the inculpatory evidence, the remaining evidence is sufficient to support the jury's conclusions."

Johnson, 38 S.W.3d at 58. (quoting Strickler v. Greene, 527 U.S. 263, 275, 119 S. Ct. 1936 (1999)). Essentially, "evidence is material when, because of its absence, the defendant failed to receive a fair trial, 'understood as a trial resulting in a verdict worthy of confidence.'" Id. (quoting Kyles, 514 U.S. at 434).

Based upon our review of the record, we conclude that the defendant has not demonstrated a reasonable probability that the result of the trial would have been different had his attorney been aware of the information contained in the DHS file. The DHS file does not contain direct exculpatory information. Despite the defendant's argument that the information calls into question the victim's testimony regarding her prior sexual conduct and could be used to rebut the State's medical evidence, the reports do not provide any information that could be used to rebut such medical evidence. As the State correctly points out, the information in the report only suggests that the victim may have engaged in oral sex, which would not rebut the medical evidence in this case and would not be admissible under Rule 412 of the Tennessee Rules of Evidence. Furthermore, the only evidence that James Clark had intercourse with the victim is his testimony during the hearing on the motion for a new trial. The State's failure to disclose the report did not prevent the defendant from calling Mr. Clark to testify at his trial.

With regard to the DHS worker's assessment of the defendant's home in 1995, the defense theory that the victim would have told the DHS worker about the abuse in 1995 if it were true is undermined by the victim's testimony that she was afraid for the life of her mother and siblings and by the DHS worker's testimony that she was never alone with the victim.

-13-

Nonetheless, we acknowledge that defendant could still have argued that the DHS worker, who was apparently at the defendant's home to assess the likelihood that the victim abused her cousins and/or was the victim of sexual abuse herself, would have been able to detect some sign that the victim was being raped by the defendant two or three times a week. We are unable to conclude, however, that this argument is sufficient to render the jury verdict "unworthy of confidence." Thus, the defendant's due process rights were not violated by the State's failure to disclose the contents of the DHS file.

The defendant also argues that the State had a duty to disclose the information in the DHS file pursuant to Tennessee Rule of Criminal Procedure 16. We disagree. Under Rule 16, the State is required to disclose documents and tangible objects which are "material to the preparation of the defendant's defense or are intended for use by the State as evidence in chief at the trial." For the reasons enumerated above, the information in the file is not "material to the defendant's defense." Furthermore, the information was not used or intended for use by the State in its case in chief and was, therefore, not subject to Rule 16 disclosure. This issue is without merit.

### Election of Offenses

In his last assignment of error, the defendant alleges that the trial court erred by not requiring the State to elect the particular incident upon which it was relying for the offense of incest in Count Two. In support of his position, the defendant points out that the indictment for Count Two includes activity between March 1995 and August 1997. The State filed a Bill of Particulars that covered a time span of two years and included, but was not limited to, six specific instances of vaginal penetration, between 232 and 348 unspecified instances of vaginal and/or rectal penetration, and one instance of oral penetration. At the close of the State's proof, the State announced to the trial court that it was electing the specific instance of vaginal penetration, which occurred in mid-March 1995, near the victim's birthday. The jury was not present when this announcement was made, and no instruction was given to the jury concerning the State's election after their return or at the close of the defendant's proof. In the closing argument, the State argued the multiple instances of sexual abuse described by the victim in her testimony, which spanned over a period of two years. At no time did the State inform the jury of its election for the mid-March incident in Count Two. Furthermore, the trial court never instructed the jury that an election had been made by the State. Consequently, the defendant asserts that the State's announcement of election followed by a closing argument that included a wide range of sexual allegations against the defendant without any instruction from the trial court amounted to an improper or ineffective election. We agree.

The Tennessee Constitution requires that jurors in a criminal trial reach a unanimous verdict based upon the same set of facts. State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). Primarily because of this requirement, the Tennessee Supreme Court has long recognized that "when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for

-14-

which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). This election requirement "protects a defendant's right to a unanimous jury verdict under the Tennessee Constitution by ensuring that jurors deliberate over and render a verdict based on the same offense." State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001) (citing Brown, 992 S.W.2d at 391). In addition, the election requirement "enables a defendant to prepare for a specific charge," "protects a defendant against double jeopardy," "enables the trial court to review the weight of the evidence in its capacity as thirteenth juror," and "enables the appellate court to review the legal sufficiency of the evidence." Id.

In the instant case, the State concedes that an election was required for the offense in Count Two. However, the State argues that a proper election was made by the State at the close of its proof. In addition, the State asserts that the trial court's instruction regarding evidence of other crimes or wrongs was sufficient to eliminate any confusion caused by the prosecutor's references to other instances of sexual abuse during the closing argument. The record does not support these assertions. The Tennessee Supreme Court has repeatedly held that when evidence is presented of multiple offenses that would constitute the crime charged, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. Brown, 962 S.W.2d at 137; State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). Furthermore, failure to follow this procedure is considered to be of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. Shelton, 851 S.W.2d at 138.

In the instant case, at the close of its proof, the State informed the trial court that it was electing the incident of vaginal penetration that occurred on the victim's birthday in mid-March 1995. This occurred at a time when the jury was not present in the courtroom. After the jury returned to the courtroom, no mention was made of the State's election, and the defendant put on his proof. During the State's closing argument, there was no mention of the election for the offense in Count Two. Furthermore, in the closing argument, the State reviewed the victim's testimony arguing that the defendant had intercourse with the victim on her birthday in March 1995, forced her to engage in begging sex games, raped her anally twice, forced her to perform oral sex, forced her to have sex on Mothers Day, and raped her in the shower stall in August of 1997. On rebuttal, the prosecutor again reminded the jury that the defendant introduced the victim to "a world of sodomy, . . . brutal rape, . . . [and] forced fellatio, that lasted for years."

The State argues that the following instruction to the jury made by the trial court was sufficient to cure any confusion created by the State's closing argument.

> If from the proof you find that the defendant has committed a crime or crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
>
>  . . .

> Such evidence of other crime(s), if considered by you for any purpose, must not be considered for any purpose other than [a common scheme or plan].

(emphasis added). The State correctly points out that juries are presumed to follow the instructions given by the trial judge. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). The State's reliance on the jury instruction in this case, however, is misplaced. Our review of the record reveals that neither the State nor the trial court ever informed the jury of the State's election for the offense in Count Two. The jury was never instructed that an election was required in this case. The jury was never instructed on the purpose of an election, i.e. to ensure a unanimous verdict based on the exact same set of facts. As such, the jury could not have known that except for the mid-March incident of vaginal penetration, the multiple instances of sexual abuse described by the victim and argued by the State were crimes other than that for which the defendant was on trial. Indeed, the jury was left to believe it could consider every allegation of abuse made by the victim in determining the defendant's guilt.

We conclude that the State's election for the offense in Count Two, the existence of which was never conveyed to the jury, was not sufficient to ensure a unanimous verdict. With the enormity of case law on this topic dating back to 1906, we are perplexed by such a fundamental flaw in the proceedings, i.e., the jury was never informed of the election. State v. Johnson, 53 S.W.3d 628, 631 (Tenn. 2001) (citing Jamison v. State, 94 S.W. 675 (1906)). After all, the most important purpose of the election requirement is to safeguard the defendant's right to a unanimous jury verdict. It is not the trial judge or the defense attorney who will be deliberating on the defendant's guilt. Yet, those were the only people who were informed of the State's election in this case. We must reverse the defendant's conviction on Count Two of incest and remand for a new trial. We are compelled to agree with another panel of this Court, placed in a similar position, "that the results of cases such as this are all the more tragic because they are easily preventable." State v. Herring, No. M1999-00776-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 684, at *23 (Tenn. Crim. App. at Nashville, August 24, 2000) (reversing and remanding for retrial five convictions for rape of a child based on the State's failure to make a proper election of offenses).

## CONCLUSION

After a thorough review of the record and the issues, we conclude that the State did not improperly elicit prior consistent statements of the victim during the direct examination of her; the trial court did not abuse its discretion by refusing the defendant's request to question the victim's sister about alleged prejudicial comments made out-of-court; and the defendant's constitutional rights were not violated by the State's failure to disclose non-material information requested by the defendant. Nevertheless, the defendant's conviction for incest in Count Two must be reversed and remanded for a new trial because of our conclusion that the State failed to properly elect an offense for which the conviction was sought. The judgment for Count One is affirmed.

-16-

_____
JOHN EVERETT WILLIAMS, JUDGE