IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 16, 2002 Session

**STATE OF TENNESSEE v. WANDA HINSON**

**Direct Appeal from the Circuit Court for Lewis County**
**No. 6023     Timothy L. Easter, Judge**

---

**No. M2000-02762-CCA-R3-CD- Filed September 27, 2002**

---

A Lewis County jury convicted the defendant, Wanda Hinson, of criminally negligent homicide, for which she received a one and a half year sentence, and especially aggravated burglary, for which she received a twenty-two year sentence. The trial court ordered the defendant to serve these sentences concurrently. The defendant now appeals her convictions, alleging (1) that the trial court erred by admitting a hearsay statement, (2) that the trial court erred by failing to grant a mistrial when the state improperly impeached the defendant's only alibi witness, (3) that the evidence is insufficient to support her convictions, and (4) that the trial court erred by failing to grant the defendant a new trial based on the state's failure to provide certain exculpatory evidence. For the reasons outlined below, we find that none of these allegations merit relief and accordingly affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court is Affirmed.**

JERRY SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, J. joined and DAVID H. WELLES, J. filed a dissenting opinion

Jerry Scott and John L. Kea, Murfreesboro, Tennessee for the appellant, Wanda Hinson.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Ron Davis, District Attorney General; and Jeffrey L. Long, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

On March 20, 1999, Officer Barry Carroll was stopped by Patricia Shelton and Ray Defoe. Shelton was the sister of James Shelton, whom the couple had found dead in his apartment. Proceeding to the apartment and joined by Sergeant Steve Vineyard, Carroll discovered the victim

with "a large hole in the back of his head." In addition, the victim's key lay on the floor beside him, and his "pants pockets were turned inside out." These officers secured the scene and contacted the Tennessee Bureau of Investigation (TBI).

Jerry Tenry of the TBI responded at approximately 4:00 a.m. According to this witness the victim's telephone was unplugged and the caller ID box was missing, although the bloodstained power supply for the caller ID box remained. The inside of the victim's aforementioned pants pockets were also bloodstained as if someone had reached in to take something from them. In addition, blood splatter was found on a door, the right-hand side of the hallway, the ceiling, and a light fixture. The agent further observed other signs of disarray and that the victim's money clip and wallet were missing. Nevertheless, there was no evidence of forced entry, no identifiable fingerprints, no blood other than that belonging to the victim, and no informative hair or fibers found on the body or the victim's clothing. According to Tenry two weapons were used on the victim, and the assailant would have gotten blood on himself or herself. The agent located prescription medicines under the couch, but did not find the bottles for the victim's Lortab prescriptions, which he had filled on March 17th and March 19th. Tenry also could not locate a murder weapon, although he did find clothes in a dumpster at an apartment complex close to the victim's complex. Of the items seized from the victim's apartment, TBI Agent Oakley McKinney was unable to find a matching fingerprint. On the 26th, Tenry conducted a search of the defendant's apartment and discovered nothing belonging to the victim in her home. Yet another TBI agent searched for blood in the defendant's apartment and found none.

On the morning of the 20th, the morning that the victim's sister discovered that the victim was dead, at approximately 5:00 a.m., Officer Carroll, Seargent Vineyard, Officer Barnes, and Captain Sam Livingston went to the defendant's apartment. According to some of these witnesses, it appeared as though the defendant had been up all night. There was also testimony that the defendant's husband, David Pollock, with whom the defendant lived, had smoked and paced while the police were there. Apparently none of the officers observed blood or cuts on the defendant, and she was said to have cooperated. When the defendant was later arrested, one of the officers allegedly overheard the defendant telling her mother, "I told you I was in the apartment that night."

Dr. Charles Harlan performed the autopsy on the 61-year-old diminutive victim. Harlan stated that the victim had died from blows to the left side of the head. He added that the victim's arms bore defensive wounds and that the victim's throat evidenced numerous cuts. He further opined that the weapons used were a knife and a hard object.

Also testifying was Tom Mann, a pharmacist who had filled a prescription for sixty Lortabs for the victim on March 19th, the day before the victim's murder. He further stated that he had previously filled various other prescriptions for the victim. According to Mann, although the victim's doctor had prescribed a high dosage of his medications, including Lortab and Xanax, he had seen similar dosages prescribed to others. However, he added that patients sometime abuse Lortab and Xanax.

In addition, various individuals who knew the victim and/or lived nearby testified. For example, Ami Wilson stated that she had helped the victim by grocery shopping for him and taking dinner to him. She had actually spent time with him on the day of his death and, while doing so, had noticed that he had a bottle containing Lortab and Xanax, a long leather wallet, and $23 in a money clip. Natasha Conley added that she had seen a man pacing beneath the victim's apartment at around

9:00 p.m. to 10:00 p.m. on the night of the offense. She then saw the same man along with the defendant knocking on the victim's door between 11:30 and midnight. The next morning this witness saw the defendant with a cut on her hand, appearing as though she had been awake all night, smelling like "something dead", and trying to sell the witness "little white pills." Conley further stated that the defendant had claimed to have gone to the victim's apartment because someone had told her that he was not answering his phone. This witness also acknowledged that she had initially told the district attorney that the defendant had blood on her arm, shoes, and jacket; however, she had not mentioned this detail, the cut, the odor, or the pills to the police. Kathreen Carroll recounted that she lived above the victim at the time of his death and that on the night in question she heard what sounded like two men and a woman arguing at approximately 2:00 in the morning. Later she heard a woman scream, "Oh, my God!" at which point this witness went to the window to discover two people drive away in a Grand Am. Brian Willis, who shared Carroll's apartment, indicated that he had heard a disturbance below at around 1:40 a.m. To him, it had sounded as if two men were arguing.

Carla Reynolds, who lived in the same complex with the victim, added that the defendant called her several times between approximately 10:00 p.m. to 10:30 p.m. and asked Reynolds about locating some Lortab tablets. Furthermore, the defendant asked her numerous times to call the victim for this purpose, and Reynolds finally acquiesced. The victim told Reynolds that he would sell the four pills for ten dollars each. Reynolds conveyed this information to the defendant, and the defendant complained about the victim's suggested price. Nevertheless, the defendant allegedly asked Reynolds to arrange a meeting between the victim and the defendant at Reynolds' house, but Reynolds refused because the victim had told Reynolds that he did not get along well with the defendant. Reynolds last talked to the defendant at around 12:30 a.m. Finally, Reynolds stated that she had seen the defendant a few months before trial. During that encounter the defendant had told Reynolds that they had last spoken at about 10:00 on the night in question and that Reynolds should "stick to that" story.

Various additional witnesses had contact with the defendant the day following the victim's death. Vonda Mercer, a good friend of the defendant's, stated that on the 20th the defendant had offered to sell her two knives. The defendant claimed that she was selling them because Pollock had cut her with them. Mercer also detailed that she had overheard the defendant respond to a question posed by Janice Sharp concerning what had happened to the victim. The defendant recounted that "she thought he'd got his head beat in."[1] The state also called Janice Sharp who testified that she had heard that the victim had been shot in the head, but the defendant told her otherwise. In addition, Sharp testified that the defendant sold her one of the knives. Sharp in turn gave the knife to Tina Richardson. While testifying, Tina Richardson confirmed portions of Sharp's account and indicated that the knife had smelled of cleaning fluid when she received it. Having tested the weapon, Mark Squibb, a TBI serologist, indicated that it held traces of human blood; however, Squibb was unable to tell if the blood was fresh or to type or successfully DNA test the substance because of degradation of the sample. He explained that such degradation could have been caused by a cleaning fluid.

---

[1] This statement became significant because the police had not released information regarding the cause of the victim's death at this time.

Patricia Shelton, the victim's sister, added that she had spoken with the victim at midnight on the 20th. He informed her that "Wanda was there" and spoke in a low voice throughout their conversation. Because of the call, this sister later drove with her husband to the victim's apartment to check on him. Finding the door ajar and the victim dead, she screamed, "Oh my God!" and left the apartment complex in a blue Grand Am. When Shelton encountered the defendant that day, the defendant had allegedly told her that she had not been to the apartment, but subsequently claimed that she had visited the victim's apartment while on an errand for Carla Reynolds. Additionally, Bennie Lou Fry, another sister, recalled that she had also spoken with the victim the night of the murder at approximately 12:30 a.m. During this conversation with the victim, Fry heard a knock on the victim's door, and during a later conversation with the victim at approximately 2:30 a.m., Fry heard loud banging, and the phone call was subsequently disconnected. After calling back to no avail, a woman finally answered at around 2:40 a.m. This woman confirmed that Fry had indeed called 4491, the victim's phone number, but claimed to have no knowledge of the victim.

David Pollock, the defendant's husband, testified for the defendant and claimed that the defendant went to the victim's apartment at about 9:00 p.m. for ten minutes and at about 10:00 p.m. for four to five minutes on the night in question. She then went to bed at 11:15 p.m. and remained there until 4:00 a.m. or so. Although Pollock admitted that the defendant was addicted to Lortab, he denied that he had been to the victim's apartment that night and that he had been pacing when the police had arrived at his apartment the next morning.

In rebuttal, the State presented two witnesses. Ami Wilson identified Pollock as the person whom she saw near the victim's apartment windows on the 19th. Nevertheless, she acknowledged that she had not mentioned to the police that she saw a man beneath the victim's windows and that the State had shown her a mug shot of Pollock. Thereafter, Bridget Moniz, Pollock's former girlfriend, testified that she spoke with Pollock in July following the victim's death. When she told Pollock that he needed to tell the truth about the incident, he had allegedly responded by stating, "But, Bridget, she's the mother of my children."

As aforementioned, the jury subsequently found the defendant guilty of especially aggravated robbery and criminally negligent homicide, and the defendant received concurrent sentences of one and a half years for her criminally negligent homicide conviction and twenty-two years for her especially aggravated robbery conviction. The defendant now appeals her convictions, alleging (1) that the trial court erred by admitting certain hearsay statements, (2) that the trial court erred by failing to grant a mistrial when the state improperly impeached the defendant's only alibi witness, (3) that the evidence is insufficient to support her convictions, and (4) that the trial court erred by failing to grant the defendant a new trial based on the state's failure to provide certain exculpatory evidence. After reviewing the record and applicable case law, we find that none of the defendant's allegations merit relief, and we therefore affirm the judgments of the trial court.

## Admission of Hearsay Statement

The defendant complains that the trial court erred by allowing the state to offer into evidence a hearsay statement made by the victim a few hours before his murder. After hearing testimony from the victim's two sisters, Shelton and Fry, in a jury-out hearing, the trial court eventually agreed to

allow Shelton to testify that the victim called her from his apartment around midnight a few hours before his death and in response to her question about what was wrong, the victim told her that "Wanda was there." After Shelton gave this testimony, the trial court gave the jury a limiting instruction, informing the jury that they were to consider Shelton's statement that the victim told her that "Wanda was there" for the sole purpose of "establish[ing] the defendant's presence near the time of the murder."

The trial court allowed the admission of this statement based on its interpretation of State v. Carpenter, 773 S.W.2d 1, 8-11 (Tenn. Crim. App. 1989), a case in which this Court affirmed a trial court's admission of two hearsay statements, one of which was an excited utterance and the second of which was admissible to show the identity of the subject of the other statement. In the instant case, the trial court interpreted Carpenter to allow admission of Shelton's hearsay statement in this factual scenario for "the limited purpose of establishing the defendant's presence near the time of the murder." Defense counsel objected, pointing out to the court that it had previously ruled that the hearsay statement at issue did not qualify as an excited utterance, and the trial court responded by stating that it did not believe that "the Carpenter case [is] an excited utterance [case]."

The state contends that while the hearsay statement was not admissible based on the trial court's analysis, it was admissible under the "state-of-mind hearsay exception." The defendant contends that the hearsay statement at issue is not admissible under any of the bases considered by the trial court, including Carpenter, the excited utterance exception, or the forfeiture by wrongdoing exception and that the admission of the hearsay statement had a prejudicial effect on the defendant and violated her constitutional right to confront her accusers. While we agree with the defendant that the statement was not admissible hearsay, we find that the admission of the statement was not so prejudicial as to affect the outcome of the trial because the evidence against the defendant was strong.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Moreover, a hearsay statement is not admissible unless it falls within an exception contained in the rules of evidence or otherwise by law. See Tenn. R. Evid. 802. The trial court correctly determined that the proposed hearsay statement was not admissible under the excited utterance exception because the declarant-victim was not reacting to a startling event or condition, an element of the excited utterance exception. See State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). Indeed, the victim-declarant's actions before and after he made the contested statement do not indicate that he was in a state of excitement. As noted by the trial court, before he made the contested statement to his sister, he allowed the subject of his comment, Wanda, to enter his apartment, and after he made the statement to his sister, he told his sister that he intended to lie down. Such actions do not indicate that the victim was in an excited state.

Furthermore, the hearsay statement is not admissible under Carpenter. In Carpenter, the victim-declarant made two statements referencing the defendant. Carpenter, 773 S.W.2d at 8. The victim made the first statement during a telephone conversation with her friend, Ms. Smith, at about 9:00 a.m. In the first statement, the victim named the defendant because she suspected the defendant of having stolen money from her store earlier that day. Id. The victim made the second statement during another call to Ms. Smith at approximately 6:20 p.m. Id. During this conversation, she told Ms. Smith that she would have to hang up because "that little son-of-a-bitch is coming back in the

store." Id. Ms. Smith asked the victim if she was talking about "the guy you thought got your money," and the victim responded affirmatively. Id.

The trial court allowed the admission of both hearsay statements, and this Court affirmed the trial court's decision by finding that the second hearsay statement was admissible under the excited utterance exception and that the first hearsay statement was admissible for the limited purpose of clarifying the meaning of the second hearsay statement. Id. at 10. Therefore, Carpenter did not create a new hearsay exception unrelated to the excited utterance exception, as the trial court in the instant case found, but rather allowed the admission of a second hearsay statement in order to clarify another hearsay statement that was admissible under the recognized excited utterance exception. Thus, Carpenter does not create new law allowing the admission of the contested hearsay statement in the case at bar.

The trial court also considered the admissibility of the hearsay statement under Tennessee Rule of Evidence 804(b)(6), the "forfeiture by wrongdoing" hearsay exception allowing admission of a hearsay statement "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6). While our courts have not published a case construing this hearsay exception, it appears that a hearsay statement may be admitted against a party under this exception only if that party intentionally procured the unavailability of the declarant: "Even intentional misconduct, such as killing a witness, does not qualify unless done for the purpose of procuring the witness's unavailability."[2] Neil P. Cohen, et al., Tennessee Law of Evidence § 8.39[2][c] (4th ed. 2000). Because there is no proof in the record to support a finding that the defendant harmed the victim for the purpose of procuring his unavailability, we find that the victim's hearsay statement was not admissible under this hearsay exception.

The state argues that the contested hearsay statement is admissible under the state-of-mind hearsay exception. See Tenn. R. Evid. 803(3). However, in order for the victim's statement to be admissible under the state-of-mind hearsay exception, the statement would not be a mere factual assertion offered to prove the truth of the matter asserted, as in the instant case, but it would express the declarant's "then existing state of mind, emotion, sensation, or physical condition[,] such as intent, plan, motive, design, mental feeling, pain, and bodily health[]." Tenn. R. Evid. 803(3). The victim's statement to his sister that Wanda was present in his apartment does not express the victim's sensations, emotions, or motivations, and accordingly, it was not admissible under this hearsay exception.

Nevertheless, although we find that the trial court erred by admitting the victim's hearsay statement, we find that the admission to be harmless error. While the hearsay statement was proof of the defendant's presence in the victim's apartment at approximately midnight on the night of his murder, there was other evidence linking the defendant and the victim on that evening. Specifically, the defendant's husband testified that the defendant visited the victim that evening at approximately 10:00 p.m.; a witness saw the defendant and an unidentified man kicking on the defendant's door at sometime between 11:30 p.m. and midnight; a witness testified that the defendant knew that the victim's head had been beaten, although this information had not been released to the public; the

---

[2] Examples of such intentional wrongdoing "include bribing or threatening a witness to secure the witness's unavailability." Cohen et al., supra, at § 8.39[2][d].

defendant sold a knife smelling of cleaning fluid the day after the victim's death, and the victim's throat had been slit by a knife or knife-like object; after the murder the defendant was trying to sell Lortab and Xanax tablets, the same types of prescription medications missing from the victim's apartment; and the defendant was overheard telling her mother that she was in the victim's apartment on the night of his murder. Considering the strong evidence against the defendant, we cannot say that the erroneous admission of this hearsay statement affected the outcome of the trial. We therefore find that the admission of this hearsay statement was harmless error and accordingly find that this issue does not merit relief.

### Improper Impeachment of Defense Witness

The defendant argues that the trial court erred by refusing to grant a mistrial or new trial after the state improperly impeached Pollock, the defendant's husband and alibi witness. The state contends that the defendant has waived this issue by failing to request a mistrial and that the trial court's curative instruction was sufficient to safeguard the defendant from the prejudicial effect of the impeachment evidence.

We first note that the decision regarding whether to grant a mistrial is within the trial court's sound discretion and will not be disturbed absent an abuse of that discretion. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).

In the instant case, the prosecutor asked the defendant's husband and sole alibi witness, David Pollock, whether he had ever been convicted of a crime, and Pollock responded that he had been convicted of resisting arrest. Defense counsel objected, and the trial court excused the jury. The trial court chastised the prosecutor for asking such a question without first requesting a jury-out hearing and announced that it would instruct the jury to disregard that portion of Pollock's testimony. Defense counsel then responded, "I don't know what else to do. I don't want a mistrial at this point on it. I don't think it's a basis for a mistrial, but they need . . ." The trial court then called for the jury to return and gave the following curative instruction:

> Ladies and gentlemen, just before you left the assistant district attorney asked a question of this defendant [sic] regarding prior convictions. I'm instructing you at this time, as I told you I might during the course of this process, to disregard his question and the answer. You're not to consider that for any purpose.

Because counsel did not move for a mistrial, the defendant has waived this issue on appeal. See Tenn. R. App. P. 36(a). Furthermore, we do not find that the improper impeachment evidence was so egregious as to create a "manifest necessity" for declaring mistrial. The trial court's curative instruction was sufficient to counter the potential for prejudice, and the law presumes that juries follow the instructions that they receive absent clear and convincing proof to the contrary. See State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). No proof of this nature is before this Court. For these reasons, we conclude that this issue does not merit relief.

-7-

**Sufficiency of the Evidence**

The defendant challenges the sufficiency of the evidence to support her convictions for especially aggravated robbery or criminally negligent homicide. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence in evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Id. at 779.

Especially aggravated robbery is defined as robbery that is "(1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code. Ann. § 39-13-401(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(A), (B).

Criminally negligent homicide is defined as "[c]riminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212(a).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(4).

As discussed supra, the evidence against the defendant is strong. The defendant's husband testified that the defendant visited the victim that evening at approximately 10:00 p.m., and a witness

saw the defendant and an unidentified man kicking on the defendant's door at sometime between 11:30 p.m. and midnight. The victim's sister called the victim's apartment at approximately 2:40 a.m., and a female voice answered the victim's phone, claiming to have no knowledge of the victim. Another witness spoke with the defendant several times on the night in question, the last time at approximately 12:30 a.m. During these conversations, the defendant was trying to persuade the witness to arrange a drug sale between herself and the victim. The defendant later told the witness that the last time they spoke on that night was between 9:30 and 10:00 a.m. and that the witness had better "stick to that" version of the events. Additionally, the defendant had knowledge that the victim's head had been beaten, although this information had not been released to the public. The victim's throat had been slit by a knife or knife-like object, and the defendant sold a knife smelling of cleaning fluid the day after the victim's death. Furthermore, after the victim's murder the defendant was trying to sell Lortab and Xanax tablets, the same types of prescription medications missing from the victim's apartment, and the defendant was overheard telling her mother that she was in the victim's apartment on the night of his murder. We conclude that a jury could reasonably find that the defendant had committed the crimes of criminally negligent homicide and especially aggravated robbery based on this evidence. Therefore, we find that the defendant's sufficiency of the evidence challenge lacks merit.

## Alleged *Brady* Violation

The defendant contends that the trial court erred by failing to grant her request for a new trial on the basis that the state failed to provide the defendant with the criminal records of and pending charges against three of the state's witnesses and that the state made a delayed disclosure of an exculpatory statement made by one of the state's witnesses. The defendant claims that the state violated the mandates of Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), by failing to turn over this exculpatory information.

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87; see also Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). In order to establish a due process violation under Brady, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information, whether requested or not);
2. The state must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Id.

When determining the materiality of undisclosed information, a reviewing court must establish whether "in [the] absence [of the information, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). In other words, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. Edgin, 902 S.W.2d at 390-91 (citation omitted).

Here, the defendant complains that the state failed to turn over Brady material, namely an exculpatory statement, discussed infra, and the arrest and conviction records of three state witnesses, Ami Wilson, Tina Richardson, and Vonda Mercer. Specifically, Wilson had a then pending charge against her for welfare fraud; Richardson had nine convictions for theft of property, three convictions for forgery, two convictions for writing worthless checks, and two convictions for criminal impersonation; and Mercer had one conviction for theft. The defendant claims that she could have impeached the witnesses with these convictions, as they are all convictions for crimes relating to honesty. Furthermore, she claims that she could have impeached Wilson with her pending charge for fraud in order show the witness's possible motivation for cooperating with the state in order to receive leniency during the resolution of her own case.

The defendant also claims that the impact of impeaching these three material witnesses would have been great because of the importance of the substance of their testimony. Wilson testified that on the day of the victim's murder, he possessed Lortab and Xanax pills on his person, as well as a money clip, twenty-three dollars, and a wallet, which are the only items that were discovered to have been stolen from the victim after his murder. Richardson testified that the defendant sold her a knife shortly after the victim's murder and that the knife had an odor of cleaning fluid on it when she received it from the defendant. Mercer testified that the defendant told her that she had spoken with the victim the night before his death and that the defendant went to a trailer attempting to sell a second knife the morning after the victim's murder.

In light of these witnesses' testimony, we find that while there may be a possibility that the outcome of the trial would have been different if the defendant had been able to impeach these witnesses with their arrest and conviction records, we cannot say with any certainty that there is a reasonable probability that the outcome of the trial would have been different. The state put on proof from nineteen different witnesses, and while the three witnesses in question provided substantive evidence, we cannot say that even if we were to discount their testimony, there is a reasonable probability that the result of the proceeding would have been different.

Furthermore, this Court has previously rejected arguments that a defendant was prejudiced by the state's failure to provide arrest and conviction records in response to a discovery motion. In those contexts, this Court found that the defendant was not prejudiced by the state's omission because the arrest records of potential trial witnesses and all conviction records are available upon request per statute. See Tenn. Code Ann. § 10-7-507 (stating that copies of conviction records are available to any citizen upon request); Tenn. Code Ann. § 40-32-101(c)(3) ("Release of arrest histories of a defendant or potential witness in a criminal proceeding to an attorney of record in the proceeding shall be made available to such attorney upon request."); State v. Burton, 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988) (affirming a trial court's denial of a defendant's motion to compel the state to furnish defendant with copies of the state's witnesses' arrest records); see also State v. King, 718 S.W.2d 241, 247 (Tenn. 1986), (finding that "the State has no duty, either under the Tennessee Rules of Criminal Procedure or by decisional law in this state, to provide [the arrest

histories of state's witnesses] to the defendant") (citing State v. Workman, 667 S.W.2d 44, 51 (Tenn. 1984)); State v. Guy William Rush, No. 03C01-9805-CR-00193, 1999 Tenn. Crim. App. LEXIS 1021, at *33 (Tenn. Crim. App. at Knoxville, Oct. 13, 1999) (stating that this Court has previously held that "when exculpatory evidence is equally available to the prosecution and the accused, the accused must bear the responsibility of seeking its discovery") reversed on other grounds, State v. Rush, 50 S.W.3d 424 (Tenn. 2001).

When promulgating the rule that requires prosecutorial disclosure of exculpatory evidence to defendants, the Brady Court reasoned that it would be unfair for the state to hoard and secrete evidence that could exculpate the defendant. Brady, 373 U.S. at 88. However, per Tennessee Code Annotated sections 10-7-507 and 40-32-101(c)(3), these records were available to the defendant upon request. See Tenn. Code Ann. §§ 10-7-507, 40-32-101(c)(3). Because these arrest and conviction records were equally available to the defendant, the harm that the Brady disclosure requirement was designed to prevent was not present in the instant case.[3]

We now turn to the defendant's complaint that the state failed to turn over the statement that Donna Bennett made to the police. In her statement, Bennett states that several hours after the victim's murder, Billy Hinson told her that he thought that Raymond Davidson had killed the victim in a jealous rage. Bennett also mentions that the victim told her that he had been forced to hide his medications throughout his apartment in order to prevent Billy Hinson, Teresa Williams, and the defendant from taking them from him. Furthermore, Bennett also mentions that the victim went to collect some settlement money the day before his murder with "Amy" and that he was concerned that Amy would try to "get some of his money."

Mid-trial after the state had put on six witnesses, the state disclosed this statement to the defendant in response to a Jencks request. The defendant then called the court's attention to the state's omission and requested a break so that she could arrange to subpoena Bennett. However, the defendant never apprised the court regarding her success in attempting to locate Bennett, and she failed to ever object to the late disclosure of this statement or request a continuance or mistrial. Therefore, the defendant has waived the issue and cannot now complain that she was given inadequate time to investigate the statement, as she did not request a continuance in order to do so. See Tenn. R. App. P. 36.

Furthermore, in situations where there was only a delayed disclosure of exculpatory information, in contrast to a complete failure to disclose exculpatory information, Brady does not apply, unless the delay itself causes prejudice. See Sylvester Smith v. State, No. 02C01-9801-CR-00018, 1998 Tenn. Crim. App. LEXIS 1316 (Tenn. Crim. App. at Jackson, Dec. 28, 1998); State v. Jim Inman, No. 03C01-9201-CR-00020, 1993 Tenn. Crim. App. LEXIS 781 (Tenn. Crim. App. at Knoxville, Nov. 23, 1993). Because the defendant has failed to state whether she was ever able to contact Bennett and how the delayed disclosure prejudiced her ability to procure Bennett as a witness, we cannot determine whether the delayed disclosure of this information did indeed prejudice the defendant. For these reasons, we find that this issue lacks merit.

---

[3] Moreover, while both of the cases that the defendant cites in support of her contention that the state violated the mandates of Brady, United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), address the ramifications of the prosecutor's failure to disclose impeachment evidence, both cases are distinguishable from the instant case in that the undisclosed forms of impeachment material were not prior convictions or arrest records. Bagley addresses a prosecutor's failure to disclose that witnesses would be paid for their testimony, Bagley, 473 U.S. at 672, and Giglio addresses a prosecutor's failure to disclose that a witness received a promise of immunity, Giglio, 405 U.S. at 154.

## Conclusion

For the foregoing reasons, we find that none of the defendant's allegations merit relief. Accordingly, the judgments of the trial court are AFFIRMED.

_____
JERRY L. SMITH, JUDGE